# 23-251

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

CHARLES ANTHONY GIOVINCO,

*Petitioner-Appellant,*

—against—

TIMETHEA PULLEN, WARDEN,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR PETITIONER-APPELLANT

JOHN R. QUINN
LAW OFFICE OF JOHN R. QUINN
1384 Gardiner Drive
Bay Shore, New York 11706
(646) 263-7250

*Attorneys for Petitioner-Appellant*

# **TABLE OF CONTENTS**

Preliminary Statement…………………………………………………………...1

Statement of Jurisdiction …………………………………………………. 1

Questions Presented……………………………………………………. 1

Standard of Review ……………………………………………. 3

Statement of Facts ……………………………………………………3

    A.     Mr. Giovinco's Conviction and Sentence ……………………………3

    B.     Earned Time Credits under the First Step Act ………………………4

        1.     The First Step Act …………………………………………..3

        2.     The Recidivism Reduction Program. …………………………4

        3.     Ineligibility for Time Credits . ………………………………….. 9

    C.     Prior Proceedings. .. . . . . ……………………………………...10

        1.     The Administrative Stage …………………………………... 10

        2.     The Habeas Petition in the District Court……………………11

Summary of the Argument ……………………………………………. 12

Argument …………………………………………………………14

    POINT I

    THE DILIGENT PLAIN-MEANING AND CONTEXT
    REVIEW THAT THE DISTRICT COURT SHOULD HAVE
    PERFORMED SHOWS THAT CONGRESS SPOKE
    CLEARLY AND COMPLETELY ON ELIGIBILITY……………………14

    A.     "Is Serving a Sentence for" Must
        Mean What It Says…………………………………………..14

    B.     At Every Turn, the Context Only Confirms
        the Plain Meaning of Section 3632(d)(4)(D)………………………17

i

POINT II

THE ONLY ARGUABLE ISSUE IS WHETHER THE
ELIGIBILITY AND AGGREGATION PROVISIONS
CONFLICT—AND THEY DO NOT…………………..……………….20

A.      Sections 3632(d)(4)(D) and 3584(c)
Must Each Be Given Full Effect………………………………….20

B.      The Resort to *Chevron* to Defend the BOP's Ineligibility
Classifications Takes "Administrative" Aggregation
Out of the Equation……………………………………………….23

C.      This Court Should Decline to Follow the Aggregation-
Based Decisions of the Sixth and Eighth Circuits…………………..24

D.      Guidance from this Court is Needed to Stem the
Alarming Aggregation Tide in the District Courts………………… 25

E.      In Any Event, the Aggregation Jurisprudence Arises
Out of Earlier Sentence-Reduction Programs Where,
Unlike Here, Congress Expressly Authorized
the BOP to Determine Eligibility…………………………………26

F.      The Aggregation Directive Cannot Authorize the BOP
to Alter the Specific, Judicially-Imposed Allocation
of Punishment to Crime……………………………………… 28

POINT III

EVEN IF AMBIGUITY EXISTS, SKIDMORE,
NOT CHEVRON, CONTROLS……………….……………………..29

POINT IV

THE BOP'S INTERNAL, INFORMAL PRACTICE,
DISCLOSED INCONSISTENTLY AND INCONSISTENTLY,
LACKS THE POWER TO PERSUADE…………………………..........31

ii

POINT V

IN ANY EVENT, THE BOP'S INTERPRETATION
MUST FAIL AT <u>CHEVRON</u> STEP-TWO……………………………………34

Conclusion …………………………………………………………………..36

Certificate of Compliance …………………………………………………...37

**An Addendum follows with a separate table of contents.  It contains copies of the following statutes:**

18 U.S.C. § 3632

18 U.S.C. § 3584

18 U.S.C. § 3621

18 U.S.C. § 3624

Title I of the First Step Act of 2018

iii

# **TABLE OF AUTHORITIES**

**Cases:**

Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't
    Prot. Agency, 846 F. 3d 492 (2d Cir. 2017)……………………………………..17

Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,
    467 U.S. 837 (1984)…………………………………………………………..*passim*

Christensen v. Harris Cnty., 529 U.S. 576 (2000)………………………………..29

Connecticut Nat'l Bank v. Germain, 503 U.S. 248 (1992). ………………14, 20, 21

Dean v. United States, 581 U.S. 62 (2017)…………………………………………….28

Hoffler v. Bezio, 726 F.3d 144 (2d Cir. 2013)………………………………………...3

Keeling v. LeMaster, No. 22-6126, 2023 U.S. App. LEXIS 31169
    (6th Cir. Nov. 22, 2023) …………………………………………………….. 24

Kerson v. Vermont Law School, Inc., 79 F. 4th 257 (2d Cir. 2023)………………..3

King v. Burwell, 576 U.S. 473 (2015) …………………………………………………35

Loper Bright Enter. v. Raimondo, 143 S. Ct. 2429 (2023)………………………..34

Lopez v. Terrell, 654 F.3d 176 (2d Cir. 2011),
    cert. denied, 566 U.S. 975 (2012)……………………………………………….30

MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218 (1994)……………35

Moreno v. Ives, 842 Fed. App'x 18 (9th Cir. 2020) ………………………………...29

Mt. McKinley Ins. Co. v. Corning, Inc., 399 F.3d 436 (2d Cir. 2005)…………….21

Pharoahs GC v. Small Bus. Admin., 990 F.3d 217 (2d Cir. 2021)…...…………...15

Pulsifer . United States, 39 F.4th 1018, cert. granted,
    No. 22-340, 143 S. Ct. 978 (Feb. 27, 2023)………….…………………….36

Skidmore v. Swift & Co., 323 U.S. 134 (1944)……………………………….29, 31

Sok v. Eischen, No. 23-105, 2023 U.S. App. LEXIS 21463
    (8th Cir. Aug. 17, 2023)……………………………………………….24

United States v. Brooker, 973 F.3d 228 (2d Cir. 2020)……………………14, 15, 18

United States v. Am. Soc'y of Composers, Authors & Publishers,
    627 F.3d 64 (2d Cir. 2010)…..……………………………………………… 20

United States v. Martin, 974 F.3d 124 (2d Cir. 2020)…….………………………..28

United States v. Mead Corp., 523 U.S. 218 (2001)………...………………… 29-30

United States v. Ng Lap Seng, 934 F.3d 110 (2d Cir. 2019)………………………21

Whaley v. Pliler, 22-CV-4680, 2023 WL 7243714 (S.D.N.Y. Nov. 3, 2023),
    *report and recommendation not yet adopted*..…………………………….25

Wood v. U.S., 41 U.S. 342 (1842)………………………………………………...22

**Statutes and Regulations**

18 U.S.C § 924 ……………………………………………………………………...19

18 U.S.C. § 2422(b)…………………………………………………………………3,4

18 U.S.C. § 2252(a)(4)(B)………………………………………………………...3,4

18 U.S.C. § 3559 …………………………………………………………….....15

18 U.S.C. § 3553………………………………………………………………...28, 36

18 U.S.C. § 3584(c)……………………………………………………….......*passim*

18 U.S.C. § 3624 …………………………………………………………………9, 27

18 U.S.C. § 3631…….………………………………………………….....……6,7,17

18 U.S.C. § 3632 ……………………………………………………………*passim*

18 U.S.C. § 3635……………………………………………………….………6,7,10

18 U.S.C. § 3632……………………………………………….................. *passim*

28 U.S.C. § 1291………………………………………………………………...1

28 U.S.C. § 1331………………………………………………………………...1

28 U.S.C. § 2241………………………………………………………………..1,11

28 C.F.R § 523.42…………………………………………………………………32

The First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018)…………….*passim*

**Other Legislative Materials**

Bureau of Prisons, "FSA Time Credits: A Rule," 87 FR 2705 (Jan. 19, 2022)…...33

Bureau of Prisons Program Statement 5410.01,
    https://www.bop/gov/policy/progstat/541-.01/cn2.pdf................................33

H. Rept. 115-699 (May 22, 2018)…………………………………………………..4

**Secondary Sources**

Markham, Jesse W., "The Supreme Court's New Implied Repeal Doctrine:
Expanding Judicial Power to Rewrite Legislation Under the Ballooning
Conception of "'Plain Repugnancy,'" 45 Gonz. L. Rev. 437 (2009)……………..22

**Internet Sources**

https://www.bop.gov/fsa/.........................................................................4, 5, 32

## PRELIMINARY STATEMENT

Petitioner-Appellant Charles Anthony Giovinco respectfully submits this brief in support of his appeal from an Order of the United States District Court for the District of Connecticut (Hon. Victor A. Bolden, J.), entered February 10, 2023, which denied his petition under 28 U.S.C. § 2241 to challenge his classification by the Bureau of Prisons ("BOP") as "ineligible" for the First Step Act's flagship time credits. Giovinco v. Pullen, 2023 WL 1928108 (D. Conn. Feb. 10, 2023). A. 32-32.[1]

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2241(a) and (d). This Court has jurisdiction pursuant to 28 U.S.C. §1291. The Notice of Appeal from Order was filed on February 27, 2023, 17 days after the Order. A. 39.

## QUESTIONS PRESENTED

1. The First Step Act of 2018 defines ineligibility for "time credits," the key incentive of its major prison reform program, as follows: "A prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any" of the 68 provisions of the United States Code the statute then lists. 18 U.S.C. § 3632(d)(4)(D). The question presented, as

---

[1] References are to pages in the Joint Appendix.

1

a matter of first impression in this Circuit, is whether this definition exhibits Chevron-triggering facial ambiguity?

Appellant submits that the answer to this question is "no."

2.      Decades earlier, Congress enacted the following: "Multiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single aggregate term of imprisonment." 18 U.S.C. § 3584(c).  The question presented as a matter of first impression in this Circuit is whether this statute conflicts with the First Step Act's definition of ineligibility?

Appellant submits that the answer to this question is "no."

3.      In the event the Court answers the first question in the affirmative, however, the next question (also of first impression in this Circuit) would be: whether the BOP's interpretation of eligibility for this important program— disclosed informally on a case-by-case basis in prisoner challenges but not published or promulgated in a regulation—warrants the full, force-of-law Chevron deference shown by the district court, especially where that interpretation, which arbitrarily favors ineligibility, undermines the program's main objective?

Appellant submits that the answer to this question is "no."

4.      If the Court agrees that the answer to the foregoing question is "no," the final question of first impression in this Circuit is: whether a federal prisoner is eligible for these time credits when he (a) was convicted of one eligible and one

2

ineligible offense, (b) was sentenced to the statutory maximum on the ineligible offense and fully served that time, and (c) continues to serve the lengthier concurrent sentence imposed on the eligible offense?

Appellant respectfully submits that the answer to this question is "yes."

## STANDARD OF REVIEW

The appellate review standard is de novo. See Kerson v. Vermont Law School, Inc., 79 F. 4th 257, 262 (2d Cir. 2023) ("Where the disposition presents a legal issue of statutory interpretation, we review de novo whether the district court correctly interpreted the statute."); Hoffler v. Bezio, 726 F.3d 144, 151-52 (2d Cir. 2013) ("We review de novo a district court's denial of a habeas petition brought pursuant to § 2241).

## STATEMENT OF FACTS

A. Mr. Giovinco's Conviction and Sentence

Petitioner-Appellant Charles Anthony Giovinco, a federal inmate incarcerated at the Federal Correctional Institution in Danbury, Connecticut ("FCI Danbury"), was convicted on his guilty plea in the United States District Court for the Southern District of Florida of two crimes: use of the internet to entice a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). A. 14. On February 17, 2009, Mr. Giovinco was sentenced to concurrent terms of (i) 235 months on the

3

enticement count—which is ten years and three months in excess of the ten-year statutory minimum, see 18 U.S.C. § 2422(b); (ii) 120 months for possession of child pornography—which is the statutory maximum, 18 U.S.C. § 2252(a)(b)(2); and (iii) lifetime supervised release. A. 14. It is not disputed that having been in federal custody since approximately July 28, 2008, Appellant has served the entirety of his ten-year maximum sentence. A. 21.

B.     Earned Time Credits under the First Step Act

1.  The First Step Act

The landmark criminal justice and sentencing reform legislation known as the First Step Act became law on December 18, 2018. Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018). The enactment is a mosaic of six distinct Titles, see id., § 1 (furnishing "The table of contents for this Act") that implement ambitious, forward-thinking reforms that are transforming federal sentencing and incarceration.[2] The phrase for which "First Step" is an acronym, Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person, speaks plainly of Congress's objectives. See, e.g., H. Rept. 115-699 (May 22, 2018) at 1. Equally plainspoken on the act's purpose and magnitude is the BOP's public website. See generally https://www.bop.gov. (introducing the First Step

---

[2] The Addendum to this brief contains the text of the various statutes addressed, including Title I of the First Step Act of 2018.

4

Act as "the culmination of a bi-partisan effort to improve criminal justice outcomes" and "to reduce the size of the federal prison population while also creating mechanisms to maintain public safety").[3]

The site's "Overview" of the First Step Act offers its public visitors capsule summaries of the recidivism-reduction program's time credits along with a sense of the enormity of the legislation, referencing its many watershed sentencing reforms,[4] its amending of the good-time credits formula, the mandate that the BOP house inmates near their primary residence, and the prohibition on restraints when transporting pregnant federal inmates. The site also includes the BOP's "FSA Numbers" documenting what the legislation has accomplished in these many domains, including: 3,981 retroactive sentencing reductions, 4,642 compassionate releases, 5,426 inmates in home confinement, and 8,031 in residential re-entry centers.[5]

---

[3] Once on the site, click on "Inmates," then "First Step Act."

[4] Those named on the site include: increases in the drug quantity required to trigger mandatory minimum sentences in certain drug cases, the retroactivity of the Fair Sentencing Act of 2010, the end of the "stacking" of consecutive firearm sentences, the expansion of the safety-valve provision, and the new era of compassionate release.

[5] The full web address is https://www.bop.gov/fsa/. The "numbers" include an entry titled "First Step Act Releases" but it is not clear whether these include the compassionate release and pre-release custody categories.

2. The Recidivism Reduction Program

Section 101 of the legislation, labeled "Recidivism Reduction," commissions the establishment of a program intended to bring about real, measurable rehabilitation among the federal inmate populace. See First Step Act § 101, P. L. 115-391 (codified at 18 U.S.C. §§ 3631-3635; see Addendum). Four features of the program are relevant here.

First, the program is intended to be inclusive. See, e.g., 18 U.S.C § 3631(1)-(5) (regularly referring to "each prisoner" or "all prisoners at each risk level"). Second, the blueprint Congress laid out for the BOP is specific, comprehensive, and finely calibrated to achieve its ambitious objectives. In essence, the legislation requires the Attorney General to design a program for BOP to implement that accurately assesses the recidivism risk and criminogenic needs of all federal prisoners and assigns them to the recidivism-reducing programs and productive activities appropriate for their risk levels. 18 U.S.C. § 3632 (a)(1)-(5). The eye-on-the-prize spirit of the legislation is reflected in its requirement that prisoners be assigned only to "evidence-based" programs, 18 U.S.C § 3632(b), defined as those "shown by empirical evidence to reduce recidivism," grounded in "research indicating that [that they are] likely to be effective in reducing recidivism," and "designed to help prisoners succeed in their communities upon release from prison." 18 U.S.C. § 3635(3)(A)-(B).

6

Congress elected to list thirteen specific types of qualifying programs, including training in such matters as "family relationship building," "antibullying," and "social learning and communication," plus "morals and ethics" and "cognitive behavioral treatment." Id. §3635(3)(C). The programs can also include successful prisoners helping the less successful prisoners in their programs. See 18 U.S.C. § 3635(5).

A testament to Congress's commitment to the program's success is that it chose to address the seemingly lost-cause situation of a prisoner "determined to be at a medium or high risk of recidivating and who has less than 5 years until his or her projected release date." 18 U.S.C. § 3632(d)(5). Congress provided that this prisoner "shall receive more frequent risk reassessments" than those participating successfully, and if a reassessment "shows that the prisoner's risk of recidivating or specific needs have changed," the BOP "shall update" that prisoner's recidivism risk level and reassign the prisoner to a more appropriate program. Id.

Third, Congress put the Attorney General, not the BOP, in charge. See, e.g., 18 U.S.C. §§ 3631 (captioned "Duties of the Attorney General") ("The Attorney General shall carry out this subchapter" in consultation with the BOP Director and others); 3632(a) (the AG "shall develop" the program); 3632(f) (the AG shall implement training programs for the personnel who will administer the program "to educate officers and employees on how to use the [program] in an appropriate

7

and consistent manner, as well as the reasons for using" it) (emphasis added);

3632(f) (requiring that BOP staff "demonstrate competence"). In a distinct

paragraph in the program's enactment provision, captioned "Quality Assurance,"

Congress positioned the AG as watchdog:

> In order to ensure that the [BOP] is using the [program] in an
> appropriate and consistent manner, the [AG] shall monitor and assess
> the use of the [program], which shall include conducting annual audits
> of the [BOP] regarding the use of the [program].

18 U.S.C. § 3632(g).

Fourth, Congress created "incentives and rewards" to encourage inmates to

participate. 18 U.S.C. § 3632(d). Some of these incentives and rewards are

available to any prisoner "who is successfully participating." 18 U.S.C. §

3632(d)(1). These include (i) increases in basic privileges such as telephone and

visitation, id., and (ii) "consider[ation]" by the BOP for transfer to an institution

closer to the prisoner's release residence. Id., § 3632(d)(2). The statute directs

BOP to develop policies that provide additional incentives and "shall include" at

least two of the following: increased commissary spending and product offerings,

extended email accessl, consideration for transfer to a preferred housing unit, and

"[o]ther incentives solicited from prisoners and determined appropriate" by the

BOP. Id. § 3632(d)(3).

The distinct reward of "time credits" is codified separately in subparagraph

(d)(4) of Section 3632; it provides: "A prisoner, except for an ineligible prisoner

8

under subparagraph (D), who successfully completes an evidence-based recidivism programming or productive activities, shall earn time credits" for every 30 days of successful participation, at the rate of ten days per period of successful participation; if the prisoner is "at a minimum or low risk for recidivating" and passes two consecutive assessments with no rise in risk level, an additional 5 days per period are awarded. 18 U.S.C. § 3632(d)(4)(A)(i)-(ii). The legislation mandates that the time credits be "applied toward pre-release custody or supervised release," id., § 3632(d)(4)(C), and that "eligible" prisoners be transferred into one of these types of release when they have earned time credits in an amount equal to the remainder of their imposed term of imprisonment. 18 U.S.C. § 3624(g)(1)(A).

3.　　Ineligibility for Time Credits

Congress defined ineligibility for time credits in Section 3632(d)(4)(D), captioned "Ineligible prisoners," which provides:

> A prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any of the following provisions of law.

18 U.S.C. § 3624(d)(4)(D).

The "following provisions" are 68 statutes defining criminal offenses, each earning its own subparagraph. Relevant here, the 41st provision is "Section 2252, relating to . . . material involving the sexual exploitation of minors," which covers Appellant's conviction and 10-year sentence for violation of 18 U.S.C.

9

2252(a)(4)(B). See 18 U.S.C. § 3632(d)(4)(D) (xli). Appellant's other offense of conviction (use of the internet to entice a minor in violation of 18 U.S.C. § 2422(b)), for which he continues to serve the 235-month sentence, is not on the statute's list.[6]

## C.     Prior Proceedings

### 1.     The Administrative Stage

Appellant first sought to be reclassified as eligible for First Step Act time credits through BOP's informal resolution procedure on or about January 11, 2022. See A. 23. He asserted that he should be eligible because he had completed serving the statutory maximum sentence imposed on his ineligible offense (possession of child pornography.). A. 23. The Correctional Counselor responded that the "request cannot be allowed at this level" and directed Appellant to "continue with the administrative remedy process." A. 23. On February 1, 2022, Appellant filed the required request for administrative relief. A. 22. The BOP denied the request in a decision dated February 17, 2022 that advised Appellant: "Upon review, you were found guilty of 18: 2252(A)(4)(B), Possession of Child

---

[6] The statute also includes a brief "definitions" section. It provides that "[t]he term 'prisoner' means a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the [BOP]," 18 U.S.C. § 3635(4), but does not further address ineligibility.

10

Porn. This offense precludes you from earning and applying" First Step Act time credits. A. 24.

Appellant filed his Regional Administrative Appeal on February 27, 2023. A. 24. On April 15, 2022 that appeal was denied. A. 26. That decision advised Appellant as follows:

> Any inmate sentenced under the U.S. Code in the custody of the [BOP] who is not serving a term of imprisonment for a convicted specified in 18 U.S.C. § 3632(d)(4)(D) is eligible to earn Federal Time Credits (FTC). An inmate cannot earn FTC if he or she is serving a sentence for a disqualifying offense or has a disqualifying prior conviction.
>
> . . . You are serving a sentence for Possession of Child Porn, 18 U.S.C. § 2252 (a)(4)(B), which is a disqualifying offense. You are ineligible to earn FTCs.

A. 26.

None of these administrative communications to Appellant mentions "aggregation" or 18 U.S.C. § 3584(c).

2.      The Habeas Petition in the District Court

On November 19, 2022, appearing pro se, Appellant filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.§ 1441 challenging the BOP's decision. A. 4-13. The government filed its response on January 12, 2023, see A2 (entry 7), and the District Court issued its Ruling denying the petition on February 10, 2023. A. 32-38.

11

Appellant argued there, as he does here, that he is eligible for the time credits because he has completed service of the sentence imposed on his ineligible offense. A. 7-8. In opposition, Respondent argued that the BOP was required to aggregate sentences for administrative purposes and to treat Appellant has serving a single aggregate sentence of 235 months for both his eligible and ineligible offenses. A. 34-5.

The district court rejected Appellant's position as unsupported by the plain meaning of the definition of ineligibility in Section 3632(d)(4)(D). A. 36. The court found instead that the statute is facially ambiguous because it does not expressly address how to determine the eligibility of prisoners such as Appellant sentenced to multiple concurrent terms. A. 36. Having found statutory ambiguity, the court next cited <u>Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984), and under that case, deferred to the BOP's Section 3584(c) aggregation practice as an acceptable interpretation of time-credit eligibility under the First Step Act. A. 36-8.

## SUMMARY OF THE ARGUMENT

The district court erred in finding the clearly-worded definition of ineligibility to be facially ambiguous. Its analysis falls short in many respects: the court read the statute superficially; it did not examine the full statutory framework; it did not appreciate the import and groundbreaking nature of the time-credit

program; it did not see that the time-credit program differs from other "reward" and "incentive" programs already on the books in that here, Congress did *not* give the BOP the discretion over eligibility that it has in those other programs; and it overlooked the explicitness of the Congressional mandate, palpable throughout the statute, that the BOP implement the program by following the codified blueprint *exactly as written*. The ensuing resort to <u>Chevron</u>, therefore, was legal error.

The only issue here is the possibility that the statute requiring aggregation of multiple terms of imprisonment for administrative purposes and the First Step Act's definition of eligibility conflict. The district court mistakenly thought they do. It then committed reversible error by affording the aggregation statute greater authority on the question of First Step Act time-credit eligibility than the definition of eligibility in the First Step Act itself.

The district court's blind spot was its conflation of the concepts of legislative and administrative acts. The statutory requirement that multiple sentences be aggregated "for administrative purposes" does not authorize aggregation for *any* purpose, nor does it state or imply that aggregation is always or inherently "administrative." The aggregation statute, therefore, cannot possibly be authority for the BOP to interpret another statute, which is a legislative act. The latter point is not disputed: the resort to <u>Chevron</u> deference to validate what the BOP is doing concedes it (i.e., if it takes <u>Chevron</u> to defend its practice of aggregating for

13

eligibility assessments, that's because the practice is legislative—and not "administrative" within the meaning of the aggregation statute). This concession answers the possible-conflict question in the negative, eliminates the aggregation statute from the First Step Act conversation, and compels reversal of the district court decision that treated the aggregation mandate as dispositive of Appellant's petition.

**ARGUMENT**

**POINT I**

**THE DILIGENT PLAIN-MEANING AND CONTEXT
REVIEW THAT THE DISTRICT COURT SHOULD HAVE
PERFORMED SHOWS THAT CONGRESS SPOKE
CLEARLY AND COMPLETELY ON ELIGIBILITY**

A.      "Is Serving a Sentence for" Must Mean What It Says

The Supreme Court "has stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992) (cleaned up).

Having recently construed another important provision of the First Step Act, this Court likewise spoke emphatically on the interpretive endeavor: "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to it." United States v. Brooker, 973 F.3d 228, 234-35 (2d Cir. 2020)

14

(internal quotation and citation omitted).  Accordingly, under <u>Brooker</u>, "[a]s with most cases of statutory interpretation, we begin with the text."  <u>Id.</u> at 234.  <u>See also</u> <u>Pharoahs GC v. Small Bus. Admin.</u>, 990 F. 3d 217, 228 (2d Cir. 2021) ("In a statutory construction case, the beginning point must be the language of the statute") (cleaned up).

Ineligibility is defined in a straightforward sentence devoid of any abstract nouns or open-ended modifiers.  Congress said simply that  "a prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any of the" 68 enumerated statutes.  18 U.S.C. § 3632(d)(4)(D).  No portion of this sentence is unclear.  "Serving a sentence for" does not say or mean "is (or was ever) convicted of."  Congress could have said that a prior conviction for any of the listed offenses established ineligibility but it did not; instead, it added prior conviction as a component to only one of the 68 provisions.  <u>See</u> 18 U.S.C. §3632(d)(4)(D)(li) (prisoners ineligible if they are serving a sentence of more than one year for "an offense described in section 3559(c)(2)(F)"—which defines a "serious violent felony"—and [they have] a previous conviction for" a serious violent felony).  This shows (i) that Congress was precise about time, and (ii) that for the other 67 listed offenses, there is no basis to interpret "is serving a sentence" as including the concept of a "prior conviction" or the categorical "never," a theme the government expressly argued

15

below.  See Gov't Opp. at 4 ("Crucial to the issue presented in this Petition is the subsection of the FSA that categorically delineates which inmates are *never* eligible to earn FSA credits.").

The simplicity of this terse definition reflects considered precision as to both time and number.  "Is serving"—a present progressive, the tense used for events that are happening now (and, necessarily, may change) does not and cannot mean "was serving" or "has ever served."  Exactness as to number is evident in the use of the singular article plus singular noun, "a sentence."  Finally, the sheer length of the list of ineligible offenses indicates that Congress intended its definition of ineligibility to be complete.  See Chevron, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.")   The district court's perfunctory analysis cannot qualify as an authentic effort to ascertain Congress's intention.

In sum, it is undisputed that Appellant served the entirety of the 10-year statutory maximum sentence imposed for his conviction of his ineligible offense. It is also undisputed that Appellant is serving out the remainder of the 235-month sentence imposed for a conviction that is *not* one of the 68 that Congress said would make him ineligible.  Because Appellant is no longer serving a sentence for

16

an ineligible offense, he is eligible for the time credits.  The decision of the district court to the contrary must therefore be reversed.

B.    At Every Turn, the Context Only Confirms
the Plain Meaning of Section 3632(d)(4)(D)

"A statutory provision's plain meaning may be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute."  <u>Catskill Mountains Chapter of Trout Unlimited, Inc. v. Env't Prot. Agency</u>, 846 F. 3d 492, 513 (2d Cir. 2017).  Although the district court recited this basic proposition, the *only* context the court considered was the aggregation statute.  <u>See</u> A. 37 ("'And when interpreting a statute, the language must be read in context'. … Thus, this provision must be read in the context of the BOP's statutory obligation to aggregate concurrent and consecutive sentences for administrative purposes.") (internal citations omitted).

The court gave no consideration to any of the following important context confirming that Congress meant what it wrote in the ineligibility definition.

First, as detailed above, the enabling legislation for the program for which time credits are the incentive reflect a serious, comprehensive, and precise blueprint for an inclusive program.  The specificity and comprehensiveness with which Congress spelled out what it expects from the BOP speak for themselves.  Congress placed the daily administering of the recidivism-reduction program in BOP's hands, <u>see</u> 18 U.S.C. § 3632 (a)-(c), but the legal definition of ineligibility

17

stands alone in its own subparagraph that, in contrast to the program blueprint sections, *makes no reference* to the BOP. This strongly signals that Congress did *not* intend to assign the BOP any legislative authority to interpret that provision, much less, as occurred here, in a manner that *favors ineligibility*. The only "administrative" task required of the BOP at the eligibility stage is a careful review of the prisoner's judgment and commitment to ascertain the offense(s) for which that prisoner currently "is serving a sentence."

Second, as detailed above, Congress directed the AG to keep a steady, watchful eye on the BOP's implementation of this important new program. It is not likely Congress would, in the very same legislation, give the BOP the authority to interpret a key statutory term.

One of the forces driving Congress to enact the First Step Act was its dissatisfaction with the BOP on a host of fronts, from the inappropriate manner in which BOP staff transported pregnant inmates, see First Step Act, § 301 (prohibiting the use of restraints on pregnant inmates) to the near-complete abdication of its compassionate release obligations. See Brooker, 973 F.3d at 231-32 (describing that fact that in the First Step Act Congress removed BOP as the sole arbiter of compassionate release motions because of its several "failures" in managing the program). It is not surprising, therefore, that for this important new prison reform program Congress elected to delineate and cabin the BOP's working

18

parameters in such detail and to position the AG as ongoing watchdog. Congress would not delegate the authority to interpret the gateway provision for one of the statute's important new programs to the very agency whose shortcomings prompted it to enact the legislation.

Third, two provisions within the recidivism-reduction legislation *do* speak to the subject of concurrent and consecutive sentences. See First Step Act § 105, Pub. L.115-391. 132 Stat. 5194, 5214 (the "Rule of Construction," prohibiting transfer to pre-release custody of "a prisoner . . . who is serving a term of imprisonment pursuant to a conviction for an offense under the laws of one of the 50 States…"); 18 U.S.C. § 3632(d)(4)(D)(xxii) (prisoners ineligible if serving a sentence for violating 18 U.S.C. §924(c), which prohibiting the use of a firearm in connection with a crime of violence or drug trafficking crime). Congress has long mandated that Section 924(c) sentences be consecutive. 18 U.S.C. § 924(c)(1)(A) (the "punishment shall be in addition to") and (d)(2) ("no term of imprisonment . . . under this subsection shall run concurrently with any other term of imprisonment imposed on the person").

Congress's intent is plainly ascertainable from this context and must be honored. See Chevron, 467 U.S. at 843 n. 9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.");

19

Connecticut Nat'l Bank, 503 U.S. at 254 ("We have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); United States v. Am. Soc'y of Composers, Authors & Publishers, 627 F.3d 64, 72 (2d Cir. 2010) ("When the language of a statute is unambiguous, judicial inquiry is complete.") (cleaned up).

Because the district court took account of *no* relevant conduct, its conclusion that Section 3632(d)(4)(D) is ambiguous cannot stand.

## POINT II

### THE ONLY ARGUABLE ISSUE IS WHETHER THE INELIGIBILTY AND AGGREGATION STATUTES CONFLICT—AND THEY DO NOT

A.  Sections 3632(d)(4)(D) and 3584(c)
    Must Each Be Given Full Effect

Congress spoke plainly in the First Step Act when defining an "ineligible" prisoner as one who presently "is serving a sentence" for an ineligible offense; it spoke equally plainly decades earlier when it directed that multiple terms of imprisonment be aggregated as a single term "for administrative purposes." The only issue arguably presented in this case, therefore, is whether each of these two statues can be afforded its full effect.

As noted, Supreme Court cases "have stated time and time again that courts must presume that a legislature says in a statute what it means and means in a

20

statute what it says there." Connecticut Nat'l Bank, 503 U.S. at 254. In the infrequent occasions when provisions of the United States Code appear to conflict as they intersect, courts speak of this possible conflict as "repugnancy," and instruct that, except if hopelessly irreconcilable—a condition called "positive repugnancy"—the courts should find a way to give full effect to both provisions. See, e.g., id., at 253 ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws. . . a court must give effect to both."); United States v. Ng Lap Seng, 934 F.3d 110, 128 (2d Cir. 2019) (recognizing that Congress may address a subject across multiple statutes, citing Connecticut Nat'l Bank); Mt. McKinley Ins. Co. v. Corning, Inc., 399 F.3d 436, 445 (2d Cir. 2005) (reiterating that arguably overlapping statutes "must be read in a manner that gives effect to both absent a 'positive repugnancy'"). In extreme cases of irreconcilability, the doctrine recognizes the authority of a court to declare an older statute impliedly repealed or abrogated by a later enactment, but certainly never the reverse. Wood v. United States, 41 U.S. 342, 363 (1842).[7]

The district court plainly failed to give effect to both statutes.

---

[7] See generally Jesse W. Markham, Jr., "The Supreme Court's New Implied Repeal Doctrine: Expanding Judicial Power to Rewrite Legislation Under the Ballooning Conception of 'Plain Repugnancy,'" 45 Gonz. L. Rev. 437 (2009).

Instead, the district court pitted the two statutes against each other and declared the aggregation statute the winner. The opening and closing lines of the district court's analysis are critical in this respect. That analysis begins: "Courts have consistently held that sentence calculation by the BOP and the BOP's administration of incentives which reduce the length of a prisoner's term of imprisonment are administrative functions of the BOP subject to § 3584(c)" (hereinafter, "Proposition A"). A. 35 (internal citations and quotations omitted). The analysis ends with a declaration that Section 3584(c), but not the First Step Act, is a "mandate":

> The Court notes that Section 3584(c) was enacted in 1984 and, as seen above, has been considered in numerous decisions. If Congress had wanted inmates to receive [First Step Act] time credits for the portion of their sentences attributed solely to eligible offenses, it would have included such language in the statute. A. 38 n.1.[8]

This arbitrary declaration of the aggregation statute as "controlling" is inadequate and without foundation in law.

---

[8] This remark also underscores, as has been argued, that at the critical plain-reading and context stages, the district court failed to engage in a genuine, thorough study of the statute.

B.    The Resort to *Chevron* to Defend the BOP's Eligibility
      Classifications Takes "Administrative" Aggregation
      Out of the Equation

The aggregation-first approach to time-credit eligibility driving the district court's decision rests on the fallacy that an act must be administrative for purposes of the aggregation statute if an administrative agency is performing it.  This is obviously a fallacy for two reasons.  First, the statute only requires aggregation "for administrative purposes." 18 U.S.C. § 3584(c).  Aggregation might be undertaken for other purposes but the statute does not require it on these other non-administrative occasions.  Second, not everything act administrative agencies performs is administrative. They also perform legislative-like such as promulgating rule or interpreting statutes.  That is the whole point, after all, of the Chevron doctrine.

The aggregation statute, therefore, cannot possibly be authority for the BOP to interpret another statute, which it is not disputed here is a legislative act.  The resort to Chevron deference to validate what the BOP is doing concedes the point (i.e., if it takes Chevron to defend its practice of aggregating for eligibility assessments, then that practice cannot also be "administrative" within the meaning of the aggregation statute).  This concession  answers the possible-conflict question in the negative and eliminates the aggregation statute from the First Step Act

23

conversation. The district court's decision must be reversed because it treated the aggregation statute as dispositive of Appellant's petition.

C.      This Court Should Decline to Follow the Aggregation-Based Decisions of the Sixth and Eighth Circuits

The two Circuit Courts of Appeals that follow the district court's reasoning exhibit the same erroneous aggregation-based analysis. See Keeling v. LeMaster, No. 22-6126, 2023 U.S. App. LEXIS 31169, at *3-4 (6th Cir. Nov. 22, 2023) (agreeing that "courts have consistently and correctly held that the calculation of a prisoner's sentence, and the awarding of credits that reduce the length of that sentence, "are administrative functions of the BOP subject to § 3584(c)" ); Sok v. Eischen, No. 23-105, 2023 U.S. App. LEXIS 21463, at *1-2 (8th Cir. Aug. 17, 2023) (in two paragraph "opinion," holds that "district court did not err in denying Sok's petition, as the BOP correctly treated his prison terms as a single aggregated sentence for all 3 offenses, and therefore properly denied him FSA credits," citing the aggregation statute, 18 U.S.C. § 3584(c)).

Appellant therefore respectfully urges this Court to decline to follow these decisions.

D.      Guidance from this Court is Needed to Stem the
        Alarming Aggregation Tide in the District Courts

The reach of the district court's fundamentally flawed approach to the

important questions presented here especially compels reversal.  A disturbing case

in point is the most recent of the rulings to follow the district court, Whaley v.

Pliler, 22-CV-4680, 2023 WL 7243714 (S.D.N.Y. Nov. 3, 2023).[9]  In Whaley,

United States Magistrate-Judge Gabriel W. Gorenstein of the Southern District of

New York issued a report and recommendation to deny a challenge to ineligibility

brought by a prisoner in the same shoes as Appellant.  Id. at *5.  John Whaley was

convicted of both eligible and ineligible offenses, sentenced to multiple concurrent

sentences, and argued that he was eligible for First Step Act time credits because

he had fully served the length of time imposed on his ineligible offense.

Magistrate-Judge Gorenstein did not invoke Chevron; instead, he reasoned as

follows:

> We reject this argument because it is inconsistent with 18 U.S.C. §
> 3584(c), . . . BOP follows this statutory commandment.  As stated by a
> BOP official, "[i]n considering whether a particular conviction renders
> an inmate who is serving concurrent sentences statutorily ineligible
> for FSA credits, BOP considers whether any of the sentences that are a
> component of the inmate's aggregate sentence are disqualifying."
> Giddings Decl. ¶ 5. We believe this is a proper construction of the
> FSA and note that other cases have rejected challenges similar to what
> Whaley makes here.

---

[9] As of this writing, the report has not yet been adopted.  The docket shows that
petitioner filed his objections on November 30, 2023; on December 11, 2023,
respondent filed a letter seeking more time to file its response.

Id.

The district court jurisprudence is in dire straits with the proliferation of decisions such as this—i.e., a judicial officer concerned that a statute is ambiguous merely quoting a BOP employee's declaration and affording it the force of law. Although Appellant maintains that this proceeding does not genuinely trigger a Chevron-type analysis because Section 3632(d)(4)(D) is not facially ambiguous, a ruling such as Whaley is perhaps even more troubling than the district court's because it reflects utter lawlessness.

E.    In Any Event, the Aggregation Jurisprudence Arises Out of Earlier Sentence-Reduction Programs Where, Unlike Here, Congress Expressly Authorized the BOP to Determine Eligibility

The aggregation-based Proposition A recited in all the caselaw upholding the BOP's position is inapplicable here because that proposition reflects—accurately— the state of affairs in two *other* statutory programs offering sentence-reduction incentives.  As will be shown, these two other programs differs materially from the First Step Act time-credits program in that, in each of them, Congress did expressly grant to the BOP the authority to determine eligibility.

The reason for the mistaken application of Proposition A to the First Step Act time-credits is probably a matter of the similar (though not identical) vocabulary.  Without close reading of each programs enabling legislation, "good time credits," "time credits," and "sentence-reduction" for successful substance

26

abuse treatment can easily seem interchangeable for most legal questions involving

the scope of BOP's power.   But they are *not.*

In 18 U.S.C. §3621 (copy furnished in the Addendum), Congress mandated

that "every prisoner with a substance abuse problem have the opportunity to

participate in a substance abuse program," 18 U.S.C. § 3621(e)(1), but placed

*entirely* in the hands of the BOP the question of actual eligibility, see id. § 3621

(e)(5)(B)(i) (an "eligible prisoner means—a prisoner who is determined by [BOP]

to have a substance abuse problem"), as well as the decision whether to award the

statutory "incentive" of a "reduction" in custodial time.  See id. § 3621(e)(2)(A),

(B) (providing, in pertinent part, that after completing a substance abuse program,

a prisoner "shall remain in the custody of the [BOP] under such conditions as the

[BOP] deems appropriate" but also that, the "period a prisoner convicted of

nonviolent offense remains in custody . . . may be reduced by the [BOP]" with

some limitations).

In the "good time credits" program of 18 U.S.C. § Section 3624(b) (copy

furnished in the Addendum), with few parameters other than the 54-days-per-year

formula, Congress placed *entirely* in the hands of the BOP the question of

eligibility for and the awarding of the credits.  See 18 U.S.C. § 3624(b)(1)

(providing, in pertinent part, that a prisoner "may receive credit . . . subject to

determination by the [BOP] that" he displayed the requisite good conduct and that

the BOP may award "such lesser credit as the Bureau determines to be appropriate").

By contrast, as discussed, Congress itself defined eligibility in a distinct First Step Act provision that, unlike the rest of the program blueprint does not mention the BOP; it also made the awarding of credits mandatory. Proposition A accurately accounts for the BOP's discretionary roles on these two subject in the earlier programs but cannot apply here. The district court's reliance on this proposition in order to deny Appellant's petition must therefore be reversed.

F.     The Aggregation Directive Cannot Authorize the BOP to Alter the Specific, Judicially-Imposed Allocation of Punishment to Crime

Aggregation that denies a prisoner a discretionless substantive statutory entitlement to which he is plainly entitled without aggregation impinges upon the specific allocation of punishment to crime; this is impermissible. See, e.g., United States v. Martin, 974 F.3d 124, 135 (2d Cir. 2020) ("[s]entences in multiple-count cases are imposed independently for each count of conviction") (cleaned up); Dean v. United States, 581 U.S. 62, 69-70 (2017) (holding that the 18 U.S.C. § 3553(a) factors may be considered to determine "a prison *sentence for each individual offense* in a multicount case" and set "length of separate prison terms and an aggregate prison term comprising *separate sentences* for multiple counts of conviction") (emphases added). That initial allocation is a quintessentially judicial function. The aggregation statute cannot serve as the authority for an agency "to

28

replace the court's allocations, as reflected in the sentencing order, with concurrent, identical, aggregate sentences on each and every charge." Moreno v. Ives, 842 Fed. App'x 18, 24 (9th Cir. 2020) (Collins, C.J., *dissenting*). Yet that is exactly what the district court's decision endorses.

Further, by denying Appellant his statutory entitlement to time credits because of the *fact* of his ineligible conviction and despite his service of the entire sentence for that conviction, the BOP is further penalizing Appellant for that conviction—in excess of the statutory maximum penalty for that crime established by Congress and imposed by sentencing court. This is plainly beyond the constitutional pale.

## POINT III

### EVEN IF AMBIGUITY EXISTS, *SKIDMORE*, NOT *CHEVRON*, CONTROLS

The BOP interpretation of eligibility to which the district court afforded Chevron deference does not qualify for that deference but is, at most, eligible to earn interpretive weight based on its degree of persuasiveness under Skidmore v. Swift & Co., 323 U.S. 134 (1944). See Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000) ("an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. . . lack[s] the force of law. . . are entitled to respect under Skidmore but only to the extent that it has the power to persuade") (cleaned up); United States v. Mead

29

Corp., 523 U.S. 218, 228-234 (2001) (delineating the differing standards) (collecting cases); Lopez v. Terrell, 654 F. 3d 176, 183 (2d Cir. 2011) (same), cert. denied, 566 U.S. 975 (2012).

The BOP interpretation of ineligibility is an internal practice of the agency, not the product of notice and comment rulemaking, formal adjudication, or comparable disclosure and vetting. And, there is no express implied delegation of interpretive authority to the BOP on the statutory issue of eligibility. For these reasons, the interpretation simply cannot carry the force of law required for Chevron deference. Mead Corp.. 523 U.S. at 230-31 (holding that tariff classification rulings of the U.S. Customs Service were not eligible for Chevron deference for substantially similar reasons); Lopez, 654 F.3d at 182 (holding that BOP interpretation found only in internal administrative decision and letter was not entitled to Chevron deference but did qualify under less deferential Skidmore standard).

The district court's extension of full Chevron deference to the BOP's interpretation of Section 3632(d)(4)(D) is therefore erroneous as a matter of law. The decision must therefore be reversed.

**POINT IV**

**THE BOP'S INTERNAL, INFORMAL PRACTICE,
DISCLOSED INCOMPLETELY AND INCONSISTENTLY,
LACKS THE POWER TO PERSUADE**

Under Skidmore,

> The weight accorded to an administrative judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. at 140 (cleaned up).

For reasons addressed throughout this brief, the BOP's aggregation-based interpretation of time credit eligibility has no persuasive power. It is simply too at odds with the Congressional intent, discernible in the plain statutory language and context, to assess eligibility in the singular and in present tense.

Several other factors also signal the absence of a power to persuade. The first is the alarm bell that sounds as one studies closely the BOP's several public and private pronouncements on the subject. To begin, it is troubling that the BOP did not mention the aggregation statute to Appellant at the administrative remedy stage.

Second, in some of its early public pronouncements, the BOP continues to withhold. In its omnibus First Step Act Time Credits regulations codified at

31

Subpart E of 28 C.F.R. Part 523, the BOP provides a definition of ineligibility that tracks the relevant Congressional language. See 28 C.F.R. § 523.42(d)(2) (providing that, "[i]f the inmate is serving a term of imprisonment for an offense specified in 18 U.S.C. § 3632(d)(4)(D), the inmate is not eligible to earn FSA Time Credits"). On the other hand, on the BOP's current website, in the entry "Who is eligible to earn time credits," the BOP first employs slightly different words than Congress, stating that "[a]n inmate is ineligible to earn time credits if . . . [h]e or she was not convicted of a disqualifying offense."[10] "Convicted of," of course has an entirely different meaning than "is serving a sentence for," but even in this instance of varying from the statutory language the BOP is silent on aggregation.

Creating only less not more clarity, the BOP has the term "disqualifying offense" link to another page that *does* use language substantially the same as Congress's, to wit: "Under the First Step Act (FSA), an inmate is ineligible to receive time credits if they are serving a sentence for a conviction under certain provisions of law."[11] The BOP there provides a "user-friendly" summary of the listed offense but also cautions that, "[h]owever, when making a determination of time-credit eligibility the official source . . . should always be referenced," and provides a link to 18 U.S.C. § 3632(d)(4)(D).

---

[10] https://www.bop.gov/inmates/FSA/

[11] https://www.bop.gov/inmates/FSA/time_credits_disqualifying_offenses.jsp.

32

A BOP response to a public comment published in the Federal Register that suggested a more flexible eligibility standard than codified by Congress stated: "[i]t *is outside the Bureau's authority* to alter the exclusions as stated in the [First Step Act]." BOP, "FSA Time Credits: A Rule," 87 FR 2705, 2713 (Jan. 19, 2022) (emphasis added).[1] Finally, in November 2022. the BOP again described publicly its eligibility practice. Program Statement 5410.01, § 4,[12]. The BOP there states, in relevant part, that "[a]t the inmate's Initial Classification, the unit team will conduct a review of the inmate's current conviction(s) as well as prior criminal convictions to determine the inmate's eligibility to earn FTCs,," and that "[i]f an inmate is determined to be ineligible based on the current offense(s), no review of prior offenses is required."

It is significant that the BOP consistently relies on the aggregation statute when defending its stance on eligibility in the recent wave of litigation but has not disclosed this interpretive view fully in a regulation or rule (at least not that counsel for Appellant has yet located). On the one hand, incomplete disclosure is disturbing. On the other hand, the restraint may reflect BOP's private awareness that Congress did *not* expressly or impliedly grant it authority to issue a regulation formally incorporating the aggregation statute into an interpretation of Section

---

[12] https://www.bop/gov/policy/progstat/541-.01/cn2.pdf.

33

3632(d)(4)(D), and in that respect, this nondisclosure would be another key concession in this proceeding. Either way, it bears repeating that the First Step Act was intended to redress such BOP inadequacies as mishandling pregnant prisoners and failing to bring compassionate release motions on behalf of eligible inmates. The agency's trust is in question.

For these reasons, in the event the Court determines that <u>Skidmore</u> is applicable, it can also reach the power to persuade question and resolve it squarely in Appellant's favor.

## POINT V

### IN ANY EVENT, THE BOP'S INTERPRETATION MUST FAIL AT *CHEVRON* STEP-TWO

Under <u>Chevron</u>,

> If the court determines that Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 843 (cleaned up).

In the event that the analysis reaches this stage and that <u>Chevron</u> is intact, see <u>Loper Bright Enter. v. Raimondo</u>, 143 S. Ct. 2429 (2023), the Court must conclude that the BOP's "interpretation" of the statutory definition of ineligibility does not comport with any rational, permissible construction of the statute.

34

Appellant respectfully incorporates here the body of criticisms of that interpretation advanced throughout this brief.  The essential defect is that treating sentences in the aggregate is at odds with the discernible Congressional intention to create an inclusive program and to further that objective by providing a carefully worded and complete definition of eligibility.  See, e.g., MCI Telecomms. Corp. v. AT&T Co., 512 U.S. 218, 229 (1994) ("an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear"); Chevron, 467 U.S. at 842-43.

Alternatively, even where ambiguity is found, this Court has the authority to decline to open the Chevron door because of the importance of the statutory question presented.  See King v. Burwell, 576 U.S. 473, 485-86 (2015) (declining to find that Congress intended implicit delegation on the question of eligibility for credits that "are among an act's key reforms"; holding that "whether those credits are available . . . is thus a question of deep economic and political significance that is central to the statutory scheme") (cleaned up).

As Appellant has asserted throughout, the incentive of time credits is central to the First Step Act as its lead innovation; certainly eligibility for that program is too important a question to leave to an agency in the absence of express Congressional delegating authority.  Burwell, 576 U.S. at  486 ("had Congress

35

wished to assign [the question of eligibility for an important program] to an agency, it surely would have done so expressly.")  The fact that the statutory issue turns on the meaning of a simple phrase or single word does not lessen its magnitude, particularly where disqualification or ineligibility for a statutory benefit is at stake.  See, e.g, Pulsifer . United States, 39 F.4th 1018, cert. granted, No. 22-340, 143 S. Ct. 978 (Feb. 27, 2023) (granting certiorari to consider whether the word "and" in the First Step Act's amendment of the "safety valve" eligibility provision of the federal sentencing statute, 18 U.S.C. § 3553(f)(1) means "and" or "or").

## CONCLUSION

For all of the foregoing reasons, this Court should reverse the district court's ruling, hold that Appellant is eligible for time-credits under the First Step Act, and grant such other and further relief to Appellant as it may deem just and proper.

Dated:      Bay Shore, NY
            December 14, 2023

> /s/ John R. Quinn
> JOHN R. QUINN

36

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies pursuant to Fed. R. App. Pro. 32(a)(7)(C) as follows:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Second Circuit Rule 32.1(a)(4)(A), because it contains 8,019, words exclusive of those parts of the brief exempted by Fed. R. App. P. 32(a)(f).

2.      This brief complies with the typeface requirements of Fed. R. App. Pro. 32(a)(5) and the type style requirements of Fed. R. App. Pro. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 2023 in Times New Roman 14-point type.

Dated: Bay Shore, NY
December 15, 2023

/s/ John R. Quinn
JOHN R. QUINN

37

# Addendum

**TABLE OF CONTENTS**

PAGE

18 USC § 3632 .............................................. Add. 1

18 USC § 3584 .............................................. Add. 6

18 USC § 3621 .............................................. Add. 7

18 USC § 3624 .............................................. Add. 10

First Step Act of 2018 ......................................... Add. 12

**Add. 1**

## §3632. Development of risk and needs assessment system

(a) IN GENERAL.-Not later than 210 days after the date of enactment of this subchapter, the Attorney General, in consultation with the Independent Review Committee authorized by the First Step Act of 2018, shall develop and release publicly on the Department of Justice website a risk and needs assessment system (referred to in this subchapter as the "System"), which shall be used to-

(1) determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism;

(2) assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner;

(3) determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs, and in accordance with subsection (b);

(4) reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison;

(5) reassign the prisoner to appropriate evidence-based recidivism reduction programs or productive activities based on the revised determination to ensure that-

(A) all prisoners at each risk level have a meaningful opportunity to reduce their classification during the period of incarceration;

(B) to address [1] the specific criminogenic needs of the prisoner; and

(C) all prisoners are able to successfully participate in such programs;

(6) determine when to provide incentives and rewards for successful participation in evidence-based recidivism reduction programs or productive activities in accordance with subsection (e);

(7) determine when a prisoner is ready to transfer into prerelease custody or supervised release in accordance with section 3624; and

(8) determine the appropriate use of audio technology for program course materials with an understanding of dyslexia.

In carrying out this subsection, the Attorney General may use existing risk and needs assessment tools, as appropriate.

(b) ASSIGNMENT OF EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAMS.-The System shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including-

(1) programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific criminogenic needs; and

(2) information on the best ways that the Bureau of Prisons can tailor the programs to the specific criminogenic needs of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

(c) HOUSING AND ASSIGNMENT DECISIONS.-The System shall provide guidance on program grouping and housing assignment determinations and, after accounting for the safety of each prisoner and other individuals at the prison, provide that prisoners with a similar risk level be grouped together in housing and assignment decisions to the extent practicable.

(d) EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAM INCENTIVES AND PRODUCTIVE ACTIVITIES REWARDS.-The System shall provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs as follows:

(1) PHONE AND VISITATION PRIVILEGES.-A prisoner who is successfully participating in an evidence-based recidivism reduction program shall receive-

(A) phone privileges, or, if available, video conferencing privileges, for up to 30 minutes per day, and up to 510 minutes per month; and

(B) additional time for visitation at the prison, as determined by the warden of the prison.

(2) TRANSFER TO INSTITUTION CLOSER TO RELEASE RESIDENCE.-A prisoner who is successfully participating in an evidence-based recidivism reduction program shall be considered by the Bureau of Prisons for placement in a facility closer to the prisoner's release residence upon request from the prisoner and subject to-

(A) bed availability at the transfer facility;

(B) the prisoner's security designation; and

(C) the recommendation from the warden of the prison at which the prisoner is incarcerated at the time of making the request.

# Add. 2

(3) ADDITIONAL POLICIES.-The Director of the Bureau of Prisons shall develop additional policies to provide appropriate incentives for successful participation and completion of evidence-based recidivism reduction programming. The incentives shall include not less than 2 of the following:

(A) Increased commissary spending limits and product offerings.

(B) Extended opportunities to access the email system.

(C) Consideration of transfer to preferred housing units (including transfer to different prison facilities).

(D) Other incentives solicited from prisoners and determined appropriate by the Director.

(4) TIME CREDITS.-

(A) IN GENERAL.-A prisoner, except for an ineligible prisoner under subparagraph (D), who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits as follows:

(i) A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(ii) A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

(B) AVAILABILITY.-A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed-

(i) prior to the date of enactment of this subchapter; or

(ii) during official detention prior to the date that the prisoner's sentence commences under section 3585(a).

(C) APPLICATION OF TIME CREDITS TOWARD PRERELEASE CUSTODY OR SUPERVISED RELEASE.-Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

(D) INELIGIBLE PRISONERS.-A prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any of the following provisions of law:

(i) Section 32, relating to destruction of aircraft or aircraft facilities.

(ii) Section 33, relating to destruction of motor vehicles or motor vehicle facilities.

(iii) Section 36, relating to drive-by shootings.

(iv) Section 81, relating to arson within special maritime and territorial jurisdiction.

(v) Section 111(b), relating to assaulting, resisting, or impeding certain officers or employees using a deadly or dangerous weapon or inflicting bodily injury.

(vi) Paragraph (1), (7), or (8) of section 113(a), relating to assault with intent to commit murder, assault resulting in substantial bodily injury to a spouse or intimate partner, a dating partner, or an individual who has not attained the age of 16 years, or assault of a spouse, intimate partner, or dating partner by strangling, suffocating, or attempting to strangle or suffocate.

(vii) Section 115, relating to influencing, impeding, or retaliating against a Federal official by injuring a family member, except for a threat made in violation of that section.

(viii) Section 116, relating to female genital mutilation.

(ix) Section 117, relating to domestic assault by a habitual offender.

(x) Any section of chapter 10, relating to biological weapons.

(xi) Any section of chapter 11B, relating to chemical weapons.

(xii) Section 351, relating to Congressional, Cabinet, and Supreme Court assassination, kidnapping, and assault.

(xiii) Section 521, relating to criminal street gangs.

(xiv) Section 751, relating to prisoners in custody of an institution or officer.

(xv) Section 793, relating to gathering, transmitting, or losing defense information.

(xvi) Section 794, relating to gathering or delivering defense information to aid a foreign government.

(xvii) Any section of chapter 39, relating to explosives and other dangerous articles, except for section 836 (relating to the transportation of fireworks into a State prohibiting sale or use).

(xviii) Section 842(p), relating to distribution of information relating to explosives, destructive devices, and weapons of mass destruction, but only if the conviction involved a weapon of mass destruction (as defined in section 2332a(c)).

# Add. 3

(xix) Subsection (f)(3), (h), or (i) of section 844, relating to the use of fire or an explosive.

(xx) Section 871, relating to threats against the President and successors to the Presidency.

(xxi) Section 879, relating to threats against former Presidents and certain other persons.

(xxii) Section 924(c), relating to unlawful possession or use of a firearm during and in relation to any crime of violence or drug trafficking crime.

(xxiii) Section 1030(a)(1), relating to fraud and related activity in connection with computers.

(xxiv) Section 1091, relating to genocide.

(xxv) Any section of chapter 51, relating to homicide, except for section 1112 (relating to manslaughter), 1113 (relating to attempt to commit murder or manslaughter, but only if the conviction was for an attempt to commit manslaughter), 1115 (relating to misconduct or neglect of ship officers), or 1122 (relating to protection against the human immunodeficiency virus).

(xxvi) Any section of chapter 55, relating to kidnapping.

(xxvii) Any offense under chapter 77, relating to peonage, slavery, and trafficking in persons, except for sections 1593 through 1596.

(xxviii) Section 1751, relating to Presidential and Presidential staff assassination, kidnapping, and assault.

(xxix) Section 1791, relating to providing or possessing contraband in prison.

(xxx) Section 1792, relating to mutiny and riots.

(xxxi) Section 1841(a)(2)(C), relating to intentionally killing or attempting to kill an unborn child.

(xxxii) Section 1992, relating to terrorist attacks and other violence against railroad carriers and against mass transportation systems on land, on water, or through the air.

(xxxiii) Section 2113(e), relating to bank robbery resulting in death.

(xxxiv) Section 2118(c), relating to robberies and burglaries involving controlled substances resulting in assault, putting in jeopardy the life of any person by the use of a dangerous weapon or device, or death.

(xxxv) Section 2119, relating to taking a motor vehicle (commonly referred to as "carjacking").

(xxxvi) Any section of chapter 105, relating to sabotage, except for section 2152.

(xxxvii) Any section of chapter 109A, relating to sexual abuse.

(xxxviii) Section 2250, relating to failure to register as a sex offender.

(xxxix) Section 2251, relating to the sexual exploitation of children.

(xl) Section 2251A, relating to the selling or buying of children.

(xli) Section 2252, relating to certain activities relating to material involving the sexual exploitation of minors.

(xlii) Section 2252A, relating to certain activities involving material constituting or containing child pornography.

(xliii) Section 2260, relating to the production of sexually explicit depictions of a minor for importation into the United States.

(xliv) Section 2283, relating to the transportation of explosive, biological, chemical, or radioactive or nuclear materials.

(xlv) Section 2284, relating to the transportation of terrorists.

(xlvi) Section 2291, relating to the destruction of a vessel or maritime facility, but only if the conduct that led to the conviction involved a substantial risk of death or serious bodily injury.

(xlvii) Any section of chapter 113B, relating to terrorism.

(xlviii) Section 2340A, relating to torture.

(xlix) Section 2381, relating to treason.

(l) Section 2442, relating to the recruitment or use of child soldiers.

(li) An offense described in section 3559(c)(2)(F), for which the offender was sentenced to a term of imprisonment of more than 1 year, if the offender has a previous conviction, for which the offender served a term of imprisonment of more than 1 year, for a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111), voluntary manslaughter (as described in section 1112), assault with intent to commit murder (as described in section 113(a)), aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242), abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)), kidnapping (as described in chapter 55), carjacking (as described in section 2119), arson (as described in section 844(f)(3), (h), or (i)), or terrorism (as described in chapter 113B).

(lii) Section 57(b) of the Atomic Energy Act of 1954 (42 U.S.C. 2077(b)), relating to the engagement or participation in the development or production of special nuclear material.

(liii) Section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122), relating to prohibitions governing atomic weapons.

(liv) Section 101 of the Atomic Energy Act of 1954 (42 U.S.C. 2131), relating to the atomic energy license requirement.

# Add. 4

(lv) Section 224 or 225 of the Atomic Energy Act of 1954 (42 U.S.C. 2274, 2275), relating to the communication or receipt of restricted data.

(lvi) Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), relating to the sabotage of nuclear facilities or fuel.

(lvii) Section 60123(b) of title 49, relating to damaging or destroying a pipeline facility, but only if the conduct which led to the conviction involved a substantial risk of death or serious bodily injury.

(lviii) Section 401(a) of the Controlled Substances Act (21 U.S.C. 841), relating to manufacturing or distributing a controlled substance in the case of a conviction for an offense described in subparagraph (A), (B), or (C) of subsection (b)(1) of that section for which death or serious bodily injury resulted from the use of such substance.

(lix) Section 276(a) of the Immigration and Nationality Act (8 U.S.C. 1326), relating to the reentry of a removed alien, but only if the alien is described in paragraph (1) or (2) of subsection (b) of that section.

(lx) Section 277 of the Immigration and Nationality Act (8 U.S.C. 1327), relating to aiding or assisting certain aliens to enter the United States.

(lxi) Section 278 of the Immigration and Nationality Act (8 U.S.C. 1328), relating to the importation of an alien into the United States for an immoral purpose.

(lxii) Any section of the Export Administration Act of 1979 (50 U.S.C. 4611 et seq.) [2]

(lxiii) Section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705).

(lxiv) Section 601 of the National Security Act of 1947 (50 U.S.C. 3121), relating to the protection of identities of certain United States undercover intelligence officers, agents, informants, and sources.

(lxv) Subparagraph (A)(i) or (B)(i) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(A) or (2)(A) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, dispense, or knowingly importing or exporting, a mixture or substance containing a detectable amount of heroin if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

(lxvi) Subparagraph (A)(vi) or (B)(vi) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(F) or (2)(F) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof.

(lxvii) Subparagraph (A)(viii) or (B)(viii) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(H) or (2)(H) of section 1010(b) the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, or knowingly importing or exporting, a mixture of substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

(lxviii) Subparagraph (A) or (B) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1) or (2) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance, or knowingly importing or exporting a controlled substance, if the sentencing court finds that-

(I) the offense involved a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof; and

(II) the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

(E) Deportable prisoners ineligible to apply time credits.-

(i) In general.-A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws (as such term is defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17))).

(ii) Proceedings.-The Attorney General, in consultation with the Secretary of Homeland Security, shall ensure that any alien described in section 212 or 237 of the Immigration and Nationality Act (8 U.S.C. 1182, 1227) who seeks to earn time credits are subject to proceedings described in section 238(a) of that Act (8 U.S.C. 1228(a)) at a date as early as practicable during the prisoner's incarceration.

(5) Risk reassessments and level adjustment.-A prisoner who successfully participates in evidence-based recidivism reduction programming or productive activities shall receive periodic risk reassessments not

# Add. 5

less often than annually, and a prisoner determined to be at a medium or high risk of recidivating and who has less than 5 years until his or her projected release date shall receive more frequent risk reassessments. If the reassessment shows that the prisoner's risk of recidivating or specific needs have changed, the Bureau of Prisons shall update the determination of the prisoner's risk of recidivating or information regarding the prisoner's specific needs and reassign the prisoner to appropriate evidence-based recidivism reduction programming or productive activities based on such changes.

(6) RELATION TO OTHER INCENTIVE PROGRAMS.-The incentives described in this subsection shall be in addition to any other rewards or incentives for which a prisoner may be eligible.

(e) PENALTIES.-The Director of the Bureau of Prisons shall develop guidelines for the reduction of rewards and incentives earned under subsection (d) for prisoners who violate prison rules or evidence-based recidivism reduction program or productive activity rules, which shall provide-

(1) general levels of violations and resulting reductions;

(2) that any reduction that includes the loss of time credits shall require written notice to the prisoner, shall be limited to time credits that a prisoner earned as of the date of the prisoner's rule violation, and shall not include any future time credits that the prisoner may earn; and

(3) for a procedure to restore time credits that a prisoner lost as a result of a rule violation, based on the prisoner's individual progress after the date of the rule violation.

(f) BUREAU OF PRISONS TRAINING.-The Attorney General shall develop and implement training programs for Bureau of Prisons officers and employees responsible for administering the System, which shall include-

(1) initial training to educate officers and employees on how to use the System in an appropriate and consistent manner, as well as the reasons for using the System;

(2) continuing education;

(3) periodic training updates; and

(4) a requirement that such officers and employees demonstrate competence in administering the System, including interrater reliability, on a biannual basis.

(g) QUALITY ASSURANCE.-In order to ensure that the Bureau of Prisons is using the System in an appropriate and consistent manner, the Attorney General shall monitor and assess the use of the System, which shall include conducting annual audits of the Bureau of Prisons regarding the use of the System.

(h) DYSLEXIA SCREENING.-

(1) SCREENING.-The Attorney General shall incorporate a dyslexia screening program into the System, including by screening for dyslexia during-

(A) the intake process; and

(B) each periodic risk reassessment of a prisoner.

(2) TREATMENT.-The Attorney General shall incorporate programs designed to treat dyslexia into the evidence-based recidivism reduction programs or productive activities required to be implemented under this section. The Attorney General may also incorporate programs designed to treat other learning disabilities.

(Added Pub. L. 115–391, title I, §101(a), Dec. 21, 2018, 132 Stat. 5196 .)

## EDITORIAL NOTES

### REFERENCES IN TEXT

The date of enactment of this subchapter, referred to in subsecs. (a) and (d)(4)(B)(i), is the date of enactment of Pub. L. 115–391, which was approved Dec. 21, 2018.

The First Step Act of 2018, referred to in subsec. (a), is Pub. L. 115–391, Dec. 21, 2018, 132 Stat. 5194 . For complete classification of this Act to the Code, see Short Title of 2018 Amendment note under section 1 of this title and Tables.

The Export Administration Act of 1979, referred to in subsec. (d)(4)(D)(lxii), is Pub. L. 96–72, Sept. 29, 1979, 93 Stat. 503 , which was classified principally to chapter 56 (§4601 et seq.) of Title 50, War and National Defense, prior to repeal by Pub. L. 115–232, div. A, title XVII, §1766(a), Aug. 13, 2018, 132 Stat. 2232 , except for sections 11A, 11B, and 11C thereof (50 U.S.C. 4611, 4612, 4613).

[1] *So in original.*

[2] *So in original. Probably should be followed by a period.*

**Add. 6**

## §3584. Multiple sentences of imprisonment

(a) IMPOSITION OF CONCURRENT OR CONSECUTIVE TERMS.-If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively, except that the terms may not run consecutively for an attempt and for another offense that was the sole objective of the attempt. Multiple terms of imprisonment imposed at the same time run concurrently unless the court orders or the statute mandates that the terms are to run consecutively. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently.

(b) FACTORS TO BE CONSIDERED IN IMPOSING CONCURRENT OR CONSECUTIVE TERMS.-The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a).

(c) TREATMENT OF MULTIPLE SENTENCE AS AN AGGREGATE.-Multiple terms of imprisonment ordered to run consecutively or concurrently shall be treated for administrative purposes as a single, aggregate term of imprisonment.

(Added Pub. L. 98–473, title II, §212(a)(2), Oct. 12, 1984, 98 Stat. 2000 .)

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE

Section effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of this section, see section 235(a)(1) of Pub. L. 98–473, set out as a note under section 3551 of this title.

**Add. 7**

### §3621. Imprisonment of a convicted person

(a) COMMITMENT TO CUSTODY OF BUREAU OF PRISONS.-A person who has been sentenced to a term of imprisonment pursuant to the provisions of subchapter D of chapter 227 shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624.

(b) PLACE OF IMPRISONMENT.-The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering-

(1) the resources of the facility contemplated;

(2) the nature and circumstances of the offense;

(3) the history and characteristics of the prisoner;

(4) any statement by the court that imposed the sentence-

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or

(B) recommending a type of penal or correctional facility as appropriate; and

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another. The Bureau shall make available appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse. Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

(c) DELIVERY OF ORDER OF COMMITMENT.-When a prisoner, pursuant to a court order, is placed in the custody of a person in charge of a penal or correctional facility, a copy of the order shall be delivered to such person as evidence of this authority to hold the prisoner, and the original order, with the return endorsed thereon, shall be returned to the court that issued it.

(d) DELIVERY OF PRISONER FOR COURT APPEARANCES.-The United States marshal shall, without charge, bring a prisoner into court or return him to a prison facility on order of a court of the United States or on written request of an attorney for the Government.

(e) SUBSTANCE ABUSE TREATMENT.-

(1) PHASE-IN.-In order to carry out the requirement of the last sentence of subsection (b) of this section, that every prisoner with a substance abuse problem have the opportunity to participate in appropriate substance abuse treatment, the Bureau of Prisons shall, subject to the availability of appropriations, provide residential substance abuse treatment (and make arrangements for appropriate aftercare)-

(A) for not less than 50 percent of eligible prisoners by the end of fiscal year 1995, with priority for such treatment accorded based on an eligible prisoner's proximity to release date;

(B) for not less than 75 percent of eligible prisoners by the end of fiscal year 1996, with priority for such treatment accorded based on an eligible prisoner's proximity to release date; and

(C) for all eligible prisoners by the end of fiscal year 1997 and thereafter, with priority for such treatment accorded based on an eligible prisoner's proximity to release date.

(2) INCENTIVE FOR PRISONERS' SUCCESSFUL COMPLETION OF TREATMENT PROGRAM.-

(A) GENERALLY.-Any prisoner who, in the judgment of the Director of the Bureau of Prisons, has successfully completed a program of residential substance abuse treatment provided under paragraph

**Add. 8**

(1) of this subsection, shall remain in the custody of the Bureau under such conditions as the Bureau deems appropriate. If the conditions of confinement are different from those the prisoner would have experienced absent the successful completion of the treatment, the Bureau shall periodically test the prisoner for substance abuse and discontinue such conditions on determining that substance abuse has recurred.

(B) PERIOD OF CUSTODY.-The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve.

(3) REPORT.-The Bureau of Prisons shall transmit to the Committees on the Judiciary of the Senate and the House of Representatives on January 1, 1995, and on January 1 of each year thereafter, a report. Such report shall contain-

(A) a detailed quantitative and qualitative description of each substance abuse treatment program, residential or not, operated by the Bureau;

(B) a full explanation of how eligibility for such programs is determined, with complete information on what proportion of prisoners with substance abuse problems are eligible; and

(C) a complete statement of to what extent the Bureau has achieved compliance with the requirements of this title.

(4) AUTHORIZATION OF APPROPRIATIONS.-There are authorized to carry out this subsection such sums as may be necessary for each of fiscal years 2007 through 2011.

(5) DEFINITIONS.-As used in this subsection-

(A) the term "residential substance abuse treatment" means a course of individual and group activities and treatment, lasting at least 6 months, in residential treatment facilities set apart from the general prison population (which may include the use of pharmocotherapies,[1] where appropriate, that may extend beyond the 6-month period);

(B) the term "eligible prisoner" means a prisoner who is-

(i) determined by the Bureau of Prisons to have a substance abuse problem; and

(ii) willing to participate in a residential substance abuse treatment program; and

(C) the term "aftercare" means placement, case management and monitoring of the participant in a community-based substance abuse treatment program when the participant leaves the custody of the Bureau of Prisons.

(6) COORDINATION OF FEDERAL ASSISTANCE.-The Bureau of Prisons shall consult with the Department of Health and Human Services concerning substance abuse treatment and related services and the incorporation of applicable components of existing comprehensive approaches including relapse prevention and aftercare services.

(f) SEX OFFENDER MANAGEMENT.-

(1) IN GENERAL.-The Bureau of Prisons shall make available appropriate treatment to sex offenders who are in need of and suitable for treatment, as follows:

(A) SEX OFFENDER MANAGEMENT PROGRAMS.-The Bureau of Prisons shall establish non-residential sex offender management programs to provide appropriate treatment, monitoring, and supervision of sex offenders and to provide aftercare during pre-release custody.

(B) RESIDENTIAL SEX OFFENDER TREATMENT PROGRAMS.-The Bureau of Prisons shall establish residential sex offender treatment programs to provide treatment to sex offenders who volunteer for such programs and are deemed by the Bureau of Prisons to be in need of and suitable for residential treatment.

(2) REGIONS.-At least 1 sex offender management program under paragraph (1)(A), and at least one residential sex offender treatment program under paragraph (1)(B), shall be established in each region within the Bureau of Prisons.

**Add. 9**

(3) AUTHORIZATION OF APPROPRIATIONS.-There are authorized to be appropriated to the Bureau of Prisons for each fiscal year such sums as may be necessary to carry out this subsection.

(g) CONTINUED ACCESS TO MEDICAL CARE.-

(1) IN GENERAL.-In order to ensure a minimum standard of health and habitability, the Bureau of Prisons should ensure that each prisoner in a community confinement facility has access to necessary medical care, mental health care, and medicine through partnerships with local health service providers and transition planning.

(2) DEFINITION.-In this subsection, the term "community confinement" has the meaning given that term in the application notes under section 5F1.1 of the Federal Sentencing Guidelines Manual, as in effect on the date of the enactment of the Second Chance Act of 2007.

(Added Pub. L. 98–473, title II, §212(a)(2), Oct. 12, 1984, 98 Stat. 2007 ; amended Pub. L. 101–647, title XXIX, §2903, Nov. 29, 1990, 104 Stat. 4913 ; Pub. L. 103–322, title II, §20401, title III, §32001, Sept. 13, 1994, 108 Stat. 1824 , 1896; Pub. L. 109–162, title XI, §1146, Jan. 5, 2006, 119 Stat. 3112 ; Pub. L. 109–248, title VI, §622, July 27, 2006, 120 Stat. 634 ; Pub. L. 110–199, title II, §§231(f), 251(b), 252, Apr. 9, 2008, 122 Stat. 687 , 693.)

### REFERENCES IN TEXT

The date of the enactment of the Second Chance Act of 2007, referred to in subsec. (g)(2), is the date of enactment of Pub. L. 110–199, which was approved Apr. 9, 2008.

**Add. 10**

### §3624. Release of a prisoner

(a) DATE OF RELEASE.-A prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence as provided in subsection (b). If the date for a prisoner's release falls on a Saturday, a Sunday, or a legal holiday at the place of confinement, the prisoner may be released by the Bureau on the last preceding weekday.

(b) CREDIT TOWARD SERVICE OF SENTENCE FOR SATISFACTORY BEHAVIOR.-(1) A prisoner (other than a prisoner serving a sentence for a crime of violence) who is serving a term of imprisonment of more than one year, other than a term of imprisonment for the duration of the prisoner's life, shall receive credit toward the service of the prisoner's sentence, beyond the time served, of fifty-four days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term, unless the Bureau of Prisons determines that, during that year, the prisoner has not satisfactorily complied with such institutional disciplinary regulations as have been approved by the Attorney General and issued to the prisoner. A prisoner who is serving a term of imprisonment of more than 1 year for a crime of violence, other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with such institutional disciplinary regulations. If the Bureau determines that, during that year, the prisoner has not satisfactorily complied with such institutional regulations, the prisoner shall receive no such credit toward service of the prisoner's sentence or shall receive such lesser credit as the Bureau determines to be appropriate. The Bureau's determination shall be made within fifteen days after the end of each year of the sentence. Credit that has not been earned may not later be granted. Credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence.

(2) Credit toward a prisoner's service of sentence shall not be vested unless the prisoner has earned or is making satisfactory progress toward a high school diploma or an equivalent degree.

(3) The Attorney General shall ensure that the Bureau of Prisons has in effect an optional General Educational Development program for inmates who have not earned a high school diploma or its equivalent.

(4) Exemptions to the General Educational Development requirement may be made as deemed appropriate by the Director of the Federal Bureau of Prisons.

(c) PRE-RELEASE CUSTODY.-The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.

(d) ALLOTMENT OF CLOTHING, FUNDS, AND TRANSPORTATION.-Upon the release of a prisoner on the expiration of the prisoner's term of imprisonment, the Bureau of Prisons shall furnish the prisoner with-

(1) suitable clothing;

(2) an amount of money, not more than $500, determined by the Director to be consistent with the needs of the offender and the public interest, unless the Director determines that the financial position of the offender is such that no sum should be furnished; and

(3) transportation to the place of the prisoner's conviction, to the prisoner's bona fide residence within the United States, or to such other place within the United States as may be authorized by the Director.

(e) SUPERVISION AFTER RELEASE.-A prisoner whose sentence includes a term of supervised release after imprisonment shall be released by the Bureau of Prisons to the supervision of a probation officer who shall, during the term imposed, supervise the person released to the degree warranted by the conditions specified by the sentencing court. The term of supervised release commences on the day the person is released from imprisonment and runs concurrently with any Federal, State, or local term of probation or supervised release or parole for another offense to which the person is subject or becomes subject during

**Add. 11**

the term of supervised release. A term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days. No prisoner shall be released on supervision unless such prisoner agrees to adhere to an installment schedule, not to exceed two years except in special circumstances, to pay for any fine imposed for the offense committed by such prisoner.

(f) MANDATORY FUNCTIONAL LITERACY REQUIREMENT.-

(1) The Attorney General shall direct the Bureau of Prisons to have in effect a mandatory functional literacy program for all mentally capable inmates who are not functionally literate in each Federal correctional institution within 6 months from the date of the enactment of this Act.

(2) Each mandatory functional literacy program shall include a requirement that each inmate participate in such program for a mandatory period sufficient to provide the inmate with an adequate opportunity to achieve functional literacy, and appropriate incentives which lead to successful completion of such programs shall be developed and implemented.

(3) As used in this section, the term "functional literacy" means-

(A) an eighth grade equivalence in reading and mathematics on a nationally recognized standardized test;

(B) functional competency or literacy on a nationally recognized criterion-referenced test; or

(C) a combination of subparagraphs (A) and (B).

(4) Non-English speaking inmates shall be required to participate in an English-As-A-Second-Language program until they function at the equivalence of the eighth grade on a nationally recognized educational achievement test.

(5) The Chief Executive Officer of each institution shall have authority to grant waivers for good cause as determined and documented on an individual basis.

(6) A report shall be provided to Congress on an annual basis summarizing the results of this program, including the number of inmate participants, the number successfully completing the program, the number who do not successfully complete the program, and the reasons for failure to successfully complete the program.

(Added Pub. L. 98–473, title II, §212(a)(2), Oct. 12, 1984, 98 Stat. 2008 ; amended Pub. L. 99–646, §§16(a), 17(a), Nov. 10, 1986, 100 Stat. 3595 ; Pub. L. 101–647, title XXIX, §§2902(a), 2904, Nov. 29, 1990, 104 Stat. 4913 ; Pub. L. 103–322, title II, §§20405, 20412, Sept. 13, 1994, 108 Stat. 1825 , 1828.)

### REFERENCES IN TEXT

The date of the enactment of this Act, referred to in subsec. (f)(1), probably means the date of enactment of Pub. L. 101–647, which enacted subsec. (f) and was approved Nov. 29, 1990.

**Add. 12**



PUBLIC LAW 115–391—DEC. 21, 2018

FIRST STEP ACT OF 2018

**Add. 13**

132 STAT. 5194          PUBLIC LAW 115–391—DEC. 21, 2018

Public Law 115–391
115th Congress

## An Act

Dec. 21, 2018
[S. 756]

To reauthorize and amend the Marine Debris Act to promote international action
to reduce marine debris, and for other purposes.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

First Step Act of
2018.

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

18 USC 1 note.

(a) SHORT TITLE.—This Act may be cited as the "First Step
Act of 2018".

(b) TABLE OF CONTENTS.—The table of contents for this Act
is as follows:

Sec. 1.  Short title; table of contents.

TITLE I—RECIDIVISM REDUCTION

Sec. 101.  Risk and needs assessment system.
Sec. 102.  Implementation of system and recommendations by Bureau of Prisons.
Sec. 103.  GAO report.
Sec. 104.  Authorization of appropriations.
Sec. 105.  Rule of construction.
Sec. 106.  Faith-based considerations.
Sec. 107.  Independent Review Committee.

TITLE II—BUREAU OF PRISONS SECURE FIREARMS STORAGE

Sec. 201.  Short title.
Sec. 202.  Secure firearms storage.

TITLE III—RESTRAINTS ON PREGNANT PRISONERS PROHIBITED

Sec. 301.  Use of restraints on prisoners during the period of pregnancy and
           postpartum recovery prohibited.

TITLE IV—SENTENCING REFORM

Sec. 401.  Reduce and restrict enhanced sentencing for prior drug felonies.
Sec. 402.  Broadening of existing safety valve.
Sec. 403.  Clarification of section 924(c) of title 18, United States Code.
Sec. 404.  Application of Fair Sentencing Act.

TITLE V—SECOND CHANCE ACT OF 2007 REAUTHORIZATION

Sec. 501.  Short title.
Sec. 502.  Improvements to existing programs.
Sec. 503.  Audit and accountability of grantees.
Sec. 504.  Federal reentry improvements.
Sec. 505.  Federal interagency reentry coordination.
Sec. 506.  Conference expenditures.
Sec. 507.  Evaluation of the Second Chance Act program.
Sec. 508.  GAO review.

TITLE VI—MISCELLANEOUS CRIMINAL JUSTICE

Sec. 601.  Placement of prisoners close to families.
Sec. 602.  Home confinement for low-risk prisoners.
Sec. 603.  Federal prisoner reentry initiative reauthorization; modification of im-
           posed term of imprisonment.

PUBLIC LAW 115–391—DEC. 21, 2018          132 STAT. 5195

Sec. 604. Identification for returning citizens.
Sec. 605. Expanding inmate employment through Federal Prison Industries.
Sec. 606. De-escalation training.
Sec. 607. Evidence-Based treatment for opioid and heroin abuse.
Sec. 608. Pilot programs.
Sec. 609. Ensuring supervision of released sexually dangerous persons.
Sec. 610. Data collection.
Sec. 611. Healthcare products.
Sec. 612. Adult and juvenile collaboration programs.
Sec. 613. Juvenile solitary confinement.

# TITLE I—RECIDIVISM REDUCTION

### SEC. 101. RISK AND NEEDS ASSESSMENT SYSTEM.

(a) IN GENERAL.—Chapter 229 of title 18, United States Code, is amended by inserting after subchapter C the following:

18 USC 3631 prec.

"SUBCHAPTER D—RISK AND NEEDS ASSESSMENT SYSTEM

"Sec.
"3631. Duties of the Attorney General.
"3632. Development of risk and needs assessment system.
"3633. Evidence-based recidivism reduction program and recommendations.
"3634. Report.
"3635. Definitions.

## "§ 3631. Duties of the Attorney General

18 USC 3631.

"(a) IN GENERAL.—The Attorney General shall carry out this subchapter in consultation with—

Consultation.

"(1) the Director of the Bureau of Prisons;

"(2) the Director of the Administrative Office of the United States Courts;

"(3) the Director of the Office of Probation and Pretrial Services;

"(4) the Director of the National Institute of Justice;

"(5) the Director of the National Institute of Corrections; and

"(6) the Independent Review Committee authorized by the First Step Act of 2018

"(b) DUTIES.—The Attorney General shall—

"(1) conduct a review of the existing prisoner risk and needs assessment systems in operation on the date of enactment of this subchapter;

Review.

"(2) develop recommendations regarding evidence-based recidivism reduction programs and productive activities in accordance with section 3633;

Recommendations.

"(3) conduct ongoing research and data analysis on—

Analysis.

"(A) evidence-based recidivism reduction programs relating to the use of prisoner risk and needs assessment tools;

"(B) the most effective and efficient uses of such programs;

"(C) which evidence-based recidivism reduction programs are the most effective at reducing recidivism, and the type, amount, and intensity of programming that most effectively reduces the risk of recidivism; and

"(D) products purchased by Federal agencies that are manufactured overseas and could be manufactured by prisoners participating in a prison work program without

**Add. 15**

132 STAT. 5196      PUBLIC LAW 115–391—DEC. 21, 2018

reducing job opportunities for other workers in the United States;

Review.
Public information.
Web posting.
Assessment.

"(4) on an annual basis, review, validate, and release publicly on the Department of Justice website the risk and needs assessment system, which review shall include—

"(A) any subsequent changes to the risk and needs assessment system made after the date of enactment of this subchapter;

"(B) the recommendations developed under paragraph (2), using the research conducted under paragraph (3);

Evaluation.

"(C) an evaluation to ensure that the risk and needs assessment system bases the assessment of each prisoner's risk of recidivism on indicators of progress and of regression that are dynamic and that can reasonably be expected to change while in prison;

"(D) statistical validation of any tools that the risk and needs assessment system uses; and

Evaluation.

"(E) an evaluation of the rates of recidivism among similarly classified prisoners to identify any unwarranted disparities, including disparities among similarly classified prisoners of different demographic groups, in such rates;

Determination.

"(5) make any revisions or updates to the risk and needs assessment system that the Attorney General determines appropriate pursuant to the review under paragraph (4), including updates to ensure that any disparities identified in paragraph (4)(E) are reduced to the greatest extent possible; and

"(6) report to Congress in accordance with section 3634.

18 USC 3632.

**"§ 3632. Development of risk and needs assessment system**

Deadline.
Consultation.
Public information.
Web posting.
Determinations.

"(a) IN GENERAL.—Not later than 210 days after the date of enactment of this subchapter, the Attorney General, in consultation with the Independent Review Committee authorized by the First Step Act of 2018, shall develop and release publicly on the Department of Justice website a risk and needs assessment system (referred to in this subchapter as the 'System'), which shall be used to—

"(1) determine the recidivism risk of each prisoner as part of the intake process, and classify each prisoner as having minimum, low, medium, or high risk for recidivism;

"(2) assess and determine, to the extent practicable, the risk of violent or serious misconduct of each prisoner;

"(3) determine the type and amount of evidence-based recidivism reduction programming that is appropriate for each prisoner and assign each prisoner to such programming accordingly, and based on the prisoner's specific criminogenic needs, and in accordance with subsection (b);

"(4) reassess the recidivism risk of each prisoner periodically, based on factors including indicators of progress, and of regression, that are dynamic and that can reasonably be expected to change while in prison;

"(5) reassign the prisoner to appropriate evidence-based recidivism reduction programs or productive activities based on the revised determination to ensure that—

"(A) all prisoners at each risk level have a meaningful opportunity to reduce their classification during the period of incarceration;

Case 23-251, Document 74, 12/15/2023, 3598691, Page62 of 81

**Add. 16**

"(B) to address the specific criminogenic needs of the prisoner; and

"(C) all prisoners are able to successfully participate in such programs;

"(6) determine when to provide incentives and rewards for successful participation in evidence-based recidivism reduction programs or productive activities in accordance with subsection (e);

"(7) determine when a prisoner is ready to transfer into prerelease custody or supervised release in accordance with section 3624; and

"(8) determine the appropriate use of audio technology for program course materials with an understanding of dyslexia. In carrying out this subsection, the Attorney General may use existing risk and needs assessment tools, as appropriate.

"(b) ASSIGNMENT OF EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAMS.—The System shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including— *Guidance.*

"(1) programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific criminogenic needs; and

"(2) information on the best ways that the Bureau of Prisons can tailor the programs to the specific criminogenic needs of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

"(c) HOUSING AND ASSIGNMENT DECISIONS.—The System shall provide guidance on program grouping and housing assignment determinations and, after accounting for the safety of each prisoner and other individuals at the prison, provide that prisoners with a similar risk level be grouped together in housing and assignment decisions to the extent practicable. *Guidance.*

"(d) EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAM INCENTIVES AND PRODUCTIVE ACTIVITIES REWARDS.—The System shall provide incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs as follows:

"(1) PHONE AND VISITATION PRIVILEGES.—A prisoner who is successfully participating in an evidence-based recidivism reduction program shall receive—

"(A) phone privileges, or, if available, video conferencing privileges, for up to 30 minutes per day, and up to 510 minutes per month; and

"(B) additional time for visitation at the prison, as determined by the warden of the prison.

"(2) TRANSFER TO INSTITUTION CLOSER TO RELEASE RESIDENCE.—A prisoner who is successfully participating in an evidence-based recidivism reduction program shall be considered by the Bureau of Prisons for placement in a facility closer to the prisoner's release residence upon request from the prisoner and subject to—

"(A) bed availability at the transfer facility;

"(B) the prisoner's security designation; and

"(C) the recommendation from the warden of the prison at which the prisoner is incarcerated at the time of making the request. *Recommendations.*

**Add. 17**

132 STAT. 5198          PUBLIC LAW 115–391—DEC. 21, 2018

"(3) ADDITIONAL POLICIES.—The Director of the Bureau of Prisons shall develop additional policies to provide appropriate incentives for successful participation and completion of evidence-based recidivism reduction programming. The incentives shall include not less than 2 of the following:

"(A) Increased commissary spending limits and product offerings.

"(B) Extended opportunities to access the email system.

"(C) Consideration of transfer to preferred housing units (including transfer to different prison facilities).

"(D) Other incentives solicited from prisoners and determined appropriate by the Director.

"(4) TIME CREDITS.—

"(A) IN GENERAL.—A prisoner, except for an ineligible prisoner under subparagraph (D), who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits as follows:

"(i) A prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

*Determination.*

"(ii) A prisoner determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.

"(B) AVAILABILITY.—A prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed—

"(i) prior to the date of enactment of this subchapter; or

"(ii) during official detention prior to the date that the prisoner's sentence commences under section 3585(a).

"(C) APPLICATION OF TIME CREDITS TOWARD PRERELEASE CUSTODY OR SUPERVISED RELEASE.—Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons

*Determination.*

shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

"(D) INELIGIBLE PRISONERS.—A prisoner is ineligible to receive time credits under this paragraph if the prisoner is serving a sentence for a conviction under any of the following provisions of law:

"(i) Section 32, relating to destruction of aircraft or aircraft facilities.

"(ii) Section 33, relating to destruction of motor vehicles or motor vehicle facilities.

"(iii) Section 36, relating to drive-by shootings.

"(iv) Section 81, relating to arson within special maritime and territorial jurisdiction.

**Add. 18**

"(v) Section 111(b), relating to assaulting, resisting, or impeding certain officers or employees using a deadly or dangerous weapon or inflicting bodily injury.

"(vi) Paragraph (1), (7), or (8) of section 113(a), relating to assault with intent to commit murder, assault resulting in substantial bodily injury to a spouse or intimate partner, a dating partner, or an individual who has not attained the age of 16 years, or assault of a spouse, intimate partner, or dating partner by strangling, suffocating, or attempting to strangle or suffocate.

"(vii) Section 115, relating to influencing, impeding, or retaliating against a Federal official by injuring a family member, except for a threat made in violation of that section.

"(viii) Section 116, relating to female genital mutilation.

"(ix) Section 117, relating to domestic assault by a habitual offender.

"(x) Any section of chapter 10, relating to biological weapons.

"(xi) Any section of chapter 11B, relating to chemical weapons.

"(xii) Section 351, relating to Congressional, Cabinet, and Supreme Court assassination, kidnapping, and assault.

"(xiii) Section 521, relating to criminal street gangs.

"(xiv) Section 751, relating to prisoners in custody of an institution or officer.

"(xv) Section 793, relating to gathering, transmitting, or losing defense information.

"(xvi) Section 794, relating to gathering or delivering defense information to aid a foreign government.

"(xvii) Any section of chapter 39, relating to explosives and other dangerous articles, except for section 836 (relating to the transportation of fireworks into a State prohibiting sale or use).

"(xviii) Section 842(p), relating to distribution of information relating to explosives, destructive devices, and weapons of mass destruction, but only if the conviction involved a weapon of mass destruction (as defined in section 2332a(c)).

"(xix) Subsection (f)(3), (h), or (i) of section 844, relating to the use of fire or an explosive.

"(xx) Section 871, relating to threats against the President and successors to the Presidency.

"(xxi) Section 879, relating to threats against former Presidents and certain other persons.

"(xxii) Section 924(c), relating to unlawful possession or use of a firearm during and in relation to any crime of violence or drug trafficking crime.

"(xxiii) Section 1030(a)(1), relating to fraud and related activity in connection with computers.

"(xxiv) Section 1091, relating to genocide.

"(xxv) Any section of chapter 51, relating to homicide, except for section 1112 (relating to manslaughter),

132 STAT. 5200          PUBLIC LAW 115–391—DEC. 21, 2018

1113 (relating to attempt to commit murder or manslaughter, but only if the conviction was for an attempt to commit manslaughter), 1115 (relating to misconduct or neglect of ship officers), or 1122 (relating to protection against the human immunodeficiency virus).

"(xxvi) Any section of chapter 55, relating to kidnapping.

"(xxvii) Any offense under chapter 77, relating to peonage, slavery, and trafficking in persons, except for sections 1593 through 1596.

"(xxviii) Section 1751, relating to Presidential and Presidential staff assassination, kidnapping, and assault.

"(xxix) Section 1791, relating to providing or possessing contraband in prison.

"(xxx) Section 1792, relating to mutiny and riots.

"(xxxi) Section 1841(a)(2)(C), relating to intentionally killing or attempting to kill an unborn child.

"(xxxii) Section 1992, relating to terrorist attacks and other violence against railroad carriers and against mass transportation systems on land, on water, or through the air.

"(xxxiii) Section 2113(e), relating to bank robbery resulting in death.

"(xxxiv) Section 2118(c), relating to robberies and burglaries involving controlled substances resulting in assault, putting in jeopardy the life of any person by the use of a dangerous weapon or device, or death.

"(xxxv) Section 2119, relating to taking a motor vehicle (commonly referred to as 'carjacking').

"(xxxvi) Any section of chapter 105, relating to sabotage, except for section 2152.

"(xxxvii) Any section of chapter 109A, relating to sexual abuse.

"(xxxviii) Section 2250, relating to failure to register as a sex offender.

"(xxxix) Section 2251, relating to the sexual exploitation of children.

"(xl) Section 2251A, relating to the selling or buying of children.

"(xli) Section 2252, relating to certain activities relating to material involving the sexual exploitation of minors.

"(xlii) Section 2252A, relating to certain activities involving material constituting or containing child pornography.

"(xliii) Section 2260, relating to the production of sexually explicit depictions of a minor for importation into the United States.

"(xliv) Section 2283, relating to the transportation of explosive, biological, chemical, or radioactive or nuclear materials.

"(xlv) Section 2284, relating to the transportation of terrorists.

"(xlvi) Section 2291, relating to the destruction of a vessel or maritime facility, but only if the conduct

Case 23-251, Document 74, 12/15/2023, 3598691, Page66 of 81

**Add. 20**

that led to the conviction involved a substantial risk of death or serious bodily injury.

"(xlvii) Any section of chapter 113B, relating to terrorism.

"(xlviii) Section 2340A, relating to torture.

"(xlix) Section 2381, relating to treason.

"(l) Section 2442, relating to the recruitment or use of child soldiers.

"(li) An offense described in section 3559(c)(2)(F), for which the offender was sentenced to a term of imprisonment of more than 1 year, if the offender has a previous conviction, for which the offender served a term of imprisonment of more than 1 year, for a Federal or State offense, by whatever designation and wherever committed, consisting of murder (as described in section 1111), voluntary manslaughter (as described in section 1112), assault with intent to commit murder (as described in section 113(a)), aggravated sexual abuse and sexual abuse (as described in sections 2241 and 2242), abusive sexual contact (as described in sections 2244(a)(1) and (a)(2)), kidnapping (as described in chapter 55), carjacking (as described in section 2119), arson (as described in section 844(f)(3), (h), or (i)), or terrorism (as described in chapter 113B).

"(lii) Section 57(b) of the Atomic Energy Act of 1954 (42 U.S.C. 2077(b)), relating to the engagement or participation in the development or production of special nuclear material.

"(liii) Section 92 of the Atomic Energy Act of 1954 (42 U.S.C. 2122), relating to prohibitions governing atomic weapons.

"(liv) Section 101 of the Atomic Energy Act of 1954 (42 U.S.C. 2131), relating to the atomic energy license requirement.

"(lv) Section 224 or 225 of the Atomic Energy Act of 1954 (42 U.S.C. 2274, 2275), relating to the communication or receipt of restricted data.

"(lvi) Section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), relating to the sabotage of nuclear facilities or fuel.

"(lvii) Section 60123(b) of title 49, relating to damaging or destroying a pipeline facility, but only if the conduct which led to the conviction involved a substantial risk of death or serious bodily injury.

"(lviii) Section 401(a) of the Controlled Substances Act (21 U.S.C. 841), relating to manufacturing or distributing a controlled substance in the case of a conviction for an offense described in subparagraph (A), (B), or (C) of subsection (b)(1) of that section for which death or serious bodily injury resulted from the use of such substance.

"(lix) Section 276(a) of the Immigration and Nationality Act (8 U.S.C. 1326), relating to the reentry of a removed alien, but only if the alien is described in paragraph (1) or (2) of subsection (b) of that section.

**Add. 21**

132 STAT. 5202          PUBLIC LAW 115–391—DEC. 21, 2018

"(lx) Section 277 of the Immigration and Nationality Act (8 U.S.C. 1327), relating to aiding or assisting certain aliens to enter the United States.

"(lxi) Section 278 of the Immigration and Nationality Act (8 U.S.C. 1328), relating to the importation of an alien into the United States for an immoral purpose.

"(lxii) Any section of the Export Administration Act of 1979 (50 U.S.C. 4611 et seq.)

"(lxiii) Section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705).

"(lxiv) Section 601 of the National Security Act of 1947 (50 U.S.C. 3121), relating to the protection of identities of certain United States undercover intelligence officers, agents, informants, and sources.

"(lxv) Subparagraph (A)(i) or (B)(i) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(A) or (2)(A) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, dispense, or knowingly importing or exporting, a mixture or substance containing a detectable amount of heroin if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

"(lxvi) Subparagraph (A)(vi) or (B)(vi) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(F) or (2)(F) of section 1010(b) of the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof.

*Determination.*
*Guidelines.*

"(lxvii) Subparagraph (A)(viii) or (B)(viii) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1)(H) or (2)(H) of section 1010(b) the Controlled Substances Import and Export Act (21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, or knowingly importing or exporting, a mixture of substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, if the sentencing court finds that the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

"(lxviii) Subparagraph (A) or (B) of section 401(b)(1) of the Controlled Substances Act (21 U.S.C. 841(b)(1)) or paragraph (1) or (2) of section 1010(b) of the Controlled Substances Import and Export Act

Case 23-251, Document 74, 12/15/2023, 3598691, Page68 of 81

**Add. 22**

(21 U.S.C. 960(b)), relating to manufacturing, distributing, dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance, or knowingly importing or exporting a controlled substance, if the sentencing court finds that—

"(I) the offense involved a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, or any analogue thereof; and

"(II) the offender was an organizer, leader, manager, or supervisor of others in the offense, as determined under the guidelines promulgated by the United States Sentencing Commission.

*Determination. Guidelines.*

"(E) DEPORTABLE PRISONERS INELIGIBLE TO APPLY TIME CREDITS.—

"(i) IN GENERAL.—A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws (as such term is defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17))).

"(ii) PROCEEDINGS.—The Attorney General, in consultation with the Secretary of Homeland Security, shall ensure that any alien described in section 212 or 237 of the Immigration and Nationality Act (8 U.S.C. 1182, 1227) who seeks to earn time credits are subject to proceedings described in section 238(a) of that Act (8 U.S.C. 1228(a)) at a date as early as practicable during the prisoner's incarceration.

*Consultation.*

"(5) RISK REASSESSMENTS AND LEVEL ADJUSTMENT.—A prisoner who successfully participates in evidence-based recidivism reduction programming or productive activities shall receive periodic risk reassessments not less often than annually, and a prisoner determined to be at a medium or high risk of recidivating and who has less than 5 years until his or her projected release date shall receive more frequent risk reassessments. If the reassessment shows that the prisoner's risk of recidivating or specific needs have changed, the Bureau of Prisons shall update the determination of the prisoner's risk of recidivating or information regarding the prisoner's specific needs and reassign the prisoner to appropriate evidence-based recidivism reduction programming or productive activities based on such changes.

*Update. Determination.*

"(6) RELATION TO OTHER INCENTIVE PROGRAMS.—The incentives described in this subsection shall be in addition to any other rewards or incentives for which a prisoner may be eligible.

"(e) PENALTIES.—The Director of the Bureau of Prisons shall develop guidelines for the reduction of rewards and incentives earned under subsection (d) for prisoners who violate prison rules or evidence-based recidivism reduction program or productive activity rules, which shall provide—

*Guidelines.*

"(1) general levels of violations and resulting reductions;

"(2) that any reduction that includes the loss of time credits shall require written notice to the prisoner, shall be limited to time credits that a prisoner earned as of the date of the prisoner's rule violation, and shall not include any future time credits that the prisoner may earn; and

*Notice.*

132 STAT. 5204          PUBLIC LAW 115–391—DEC. 21, 2018

Procedures.

"(3) for a procedure to restore time credits that a prisoner lost as a result of a rule violation, based on the prisoner's individual progress after the date of the rule violation.

"(f) BUREAU OF PRISONS TRAINING.—The Attorney General shall develop and implement training programs for Bureau of Prisons officers and employees responsible for administering the System, which shall include—

"(1) initial training to educate officers and employees on how to use the System in an appropriate and consistent manner, as well as the reasons for using the System;

"(2) continuing education;

"(3) periodic training updates; and

"(4) a requirement that such officers and employees demonstrate competence in administering the System, including interrater reliability, on a biannual basis.

Audits.

"(g) QUALITY ASSURANCE.—In order to ensure that the Bureau of Prisons is using the System in an appropriate and consistent manner, the Attorney General shall monitor and assess the use of the System, which shall include conducting annual audits of the Bureau of Prisons regarding the use of the System.

"(h) DYSLEXIA SCREENING.—

"(1) SCREENING.—The Attorney General shall incorporate a dyslexia screening program into the System, including by screening for dyslexia during—

"(A) the intake process; and

"(B) each periodic risk reassessment of a prisoner.

"(2) TREATMENT.—The Attorney General shall incorporate programs designed to treat dyslexia into the evidence-based recidivism reduction programs or productive activities required to be implemented under this section. The Attorney General may also incorporate programs designed to treat other learning disabilities.

18 USC 3633.

**"§ 3633. Evidence-based recidivism reduction program and recommendations**

Consultation.
Reviews.

"(a) IN GENERAL.—Prior to releasing the System, in consultation with the Independent Review Committee authorized by the First Step Act of 2018, the Attorney General shall—

"(1) review the effectiveness of evidence-based recidivism reduction programs that exist as of the date of enactment of this subchapter in prisons operated by the Bureau of Prisons;

"(2) review available information regarding the effectiveness of evidence-based recidivism reduction programs and productive activities that exist in State-operated prisons throughout the United States;

"(3) identify the most effective evidence-based recidivism reduction programs;

"(4) review the policies for entering into evidence-based recidivism reduction partnerships described in section 3621(h)(5); and

"(5) direct the Bureau of Prisons regarding—

"(A) evidence-based recidivism reduction programs;

"(B) the ability for faith-based organizations to function as a provider of educational evidence-based programs outside of the religious classes and services provided through the Chaplaincy; and

Case 23-251, Document 74, 12/15/2023, 3598691, Page70 of 81

**Add. 24**

"(C) the addition of any new effective evidence-based recidivism reduction programs that the Attorney General finds.

"(b) REVIEW AND RECOMMENDATIONS REGARDING DYSLEXIA MITIGATION.—In carrying out subsection (a), the Attorney General shall consider the prevalence and mitigation of dyslexia in prisons, including by—

"(1) reviewing statistics on the prevalence of dyslexia, and the effectiveness of any programs implemented to mitigate the effects of dyslexia, in prisons operated by the Bureau of Prisons and State-operated prisons throughout the United States; and

"(2) incorporating the findings of the Attorney General under paragraph (1) of this subsection into any directives given to the Bureau of Prisons under paragraph (5) of subsection (a).

### "§ 3634. Report

"Beginning on the date that is 2 years after the date of enactment of this subchapter, and annually thereafter for a period of 5 years, the Attorney General shall submit a report to the Committees on the Judiciary of the Senate and the House of Representatives and the Subcommittees on Commerce, Justice, Science, and Related Agencies of the Committees on Appropriations of the Senate and the House of Representatives that contains the following:

"(1) A summary of the activities and accomplishments of the Attorney General in carrying out this Act.

"(2) A summary and assessment of the types and effectiveness of the evidence-based recidivism reduction programs and productive activities in prisons operated by the Bureau of Prisons, including—

"(A) evidence about which programs have been shown to reduce recidivism;

"(B) the capacity of each program and activity at each prison, including the number of prisoners along with the recidivism risk of each prisoner enrolled in each program; and

"(C) identification of any gaps or shortages in capacity of such programs and activities.

"(3) Rates of recidivism among individuals who have been released from Federal prison, based on the following criteria:

"(A) The primary offense of conviction.

"(B) The length of the sentence imposed and served.

"(C) The Bureau of Prisons facility or facilities in which the prisoner's sentence was served.

"(D) The evidence-based recidivism reduction programming that the prisoner successfully completed, if any.

"(E) The prisoner's assessed and reassessed risk of recidivism.

"(F) The productive activities that the prisoner successfully completed, if any.

"(4) The status of prison work programs at facilities operated by the Bureau of Prisons, including—

"(A) a strategy to expand the availability of such programs without reducing job opportunities for workers in the United States who are not in the custody of the Bureau

18 USC 3634.

Effective date.
Time period.

Assessment.

Strategy.

132 STAT. 5206          PUBLIC LAW 115–391—DEC. 21, 2018

of Prisons, including the feasibility of prisoners manufacturing products purchased by Federal agencies that are manufactured overseas;

Assessment.

"(B) an assessment of the feasibility of expanding such programs, consistent with the strategy required under subparagraph (A), with the goal that 5 years after the date of enactment of this subchapter, not less than 75 percent of eligible minimum- and low-risk offenders have the opportunity to participate in a prison work program for not less than 20 hours per week; and

"(C) a detailed discussion of legal authorities that would be useful or necessary to achieve the goals described in subparagraphs (A) and (B).

Assessment.

"(5) An assessment of the Bureau of Prisons' compliance with section 3621(h).

Assessment.

"(6) An assessment of progress made toward carrying out the purposes of this subchapter, including any savings associated with—

"(A) the transfer of prisoners into prerelease custody or supervised release under section 3624(g), including savings resulting from the avoidance or deferral of future construction, acquisition, and operations costs; and

"(B) any decrease in recidivism that may be attributed to the System or the increase in evidence-based recidivism reduction programs required under this subchapter.

Assessment.

"(7) An assessment of budgetary savings resulting from this subchapter, including—

"(A) a summary of the amount of savings resulting from the transfer of prisoners into prerelease custody under this chapter, including savings resulting from the avoidance or deferral of future construction, acquisition, or operations costs;

"(B) a summary of the amount of savings resulting from any decrease in recidivism that may be attributed to the implementation of the risk and needs assessment system or the increase in recidivism reduction programs and productive activities required by this subchapter;

Strategy.

"(C) a strategy to reinvest the savings described in subparagraphs (A) and (B) in other—

"(i) Federal, State, and local law enforcement activities; and

"(ii) expansions of recidivism reduction programs and productive activities in the Bureau of Prisons; and

"(D) a description of how the reduced expenditures on Federal corrections and the budgetary savings resulting from this subchapter are currently being used and will be used to—

"(i) increase investment in law enforcement and crime prevention to combat gangs of national significance and high-level drug traffickers through the High Intensity Drug Trafficking Areas Program and other task forces;

"(ii) hire, train, and equip law enforcement officers and prosecutors; and

Case 23-251, Document 74, 12/15/2023, 3598691, Page72 of 81

**Add. 26**

"(iii) promote crime reduction programs using evidence-based practices and strategic planning to help reduce crime and criminal recidivism.

"(8) Statistics on—

"(A) the prevalence of dyslexia among prisoners in prisons operated by the Bureau of Prisons; and

"(B) any change in the effectiveness of dyslexia mitigation programs among such prisoners that may be attributed to the incorporation of dyslexia screening into the System and of dyslexia treatment into the evidence-based recidivism reduction programs, as required under this chapter.

## "§ 3635. Definitions

18 USC 3635.

"In this subchapter the following definitions apply:

"(1) DYSLEXIA.—The term 'dyslexia' means an unexpected difficulty in reading for an individual who has the intelligence to be a much better reader, most commonly caused by a difficulty in the phonological processing (the appreciation of the individual sounds of spoken language), which affects the ability of an individual to speak, read, and spell.

"(2) DYSLEXIA SCREENING PROGRAM.—The term 'dyslexia screening program' means a screening program for dyslexia that is—

"(A) evidence-based (as defined in section 8101(21) of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 7801(21))) with proven psychometrics for validity;

"(B) efficient and low-cost; and

"(C) readily available.

"(3) EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAM.—The term 'evidence-based recidivism reduction program' means either a group or individual activity that—

"(A) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism;

"(B) is designed to help prisoners succeed in their communities upon release from prison; and

"(C) may include—

"(i) social learning and communication, interpersonal, anti-bullying, rejection response, and other life skills;

"(ii) family relationship building, structured parent-child interaction, and parenting skills;

"(iii) classes on morals or ethics;

"(iv) academic classes;

"(v) cognitive behavioral treatment;

"(vi) mentoring;

"(vii) substance abuse treatment;

"(viii) vocational training;

"(ix) faith-based classes or services;

"(x) civic engagement and reintegrative community services;

"(xi) a prison job, including through a prison work program;

"(xii) victim impact classes or other restorative justice programs; and

"(xiii) trauma counseling and trauma-informed support programs.

"(4) PRISONER.—The term 'prisoner' means a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons.

"(5) PRODUCTIVE ACTIVITY.—The term 'productive activity' means either a group or individual activity that is designed to allow prisoners determined as having a minimum or low risk of recidivating to remain productive and thereby maintain a minimum or low risk of recidivating, and may include the delivery of the programs described in paragraph (1) to other prisoners.

"(6) RISK AND NEEDS ASSESSMENT TOOL.—The term 'risk and needs assessment tool' means an objective and statistically validated method through which information is collected and evaluated to determine—

"(A) as part of the intake process, the risk that a prisoner will recidivate upon release from prison;

"(B) the recidivism reduction programs that will best minimize the risk that the prisoner will recidivate upon release from prison; and

"(C) the periodic reassessment of risk that a prisoner will recidivate upon release from prison, based on factors including indicators of progress and of regression, that are dynamic and that can reasonably be expected to change while in prison.".

(b) CLERICAL AMENDMENT.—The table of subchapters for chapter 229 of title 18, United States Code, is amended by adding at the end the following:

**"D. Risk and Needs Assessment** .................................................................... **3631".**

**SEC. 102. IMPLEMENTATION OF SYSTEM AND RECOMMENDATIONS BY BUREAU OF PRISONS.**

(a) IMPLEMENTATION OF SYSTEM GENERALLY.—Section 3621 of title 18, United States Code, is amended by adding at the end the following:

"(h) IMPLEMENTATION OF RISK AND NEEDS ASSESSMENT SYSTEM.—

"(1) IN GENERAL.—Not later than 180 days after the Attorney General completes and releases the risk and needs assessment system (referred to in this subsection as the 'System') developed under subchapter D, the Director of the Bureau of Prisons shall, in accordance with that subchapter—

"(A) implement and complete the initial intake risk and needs assessment for each prisoner (including for each prisoner who was a prisoner prior to the effective date of this subsection), regardless of the prisoner's length of imposed term of imprisonment, and begin to assign prisoners to appropriate evidence-based recidivism reduction programs based on that determination;

"(B) begin to expand the effective evidence-based recidivism reduction programs and productive activities it offers and add any new evidence-based recidivism reduction programs and productive activities necessary to effectively implement the System; and

"(C) begin to implement the other risk and needs assessment tools necessary to effectively implement the System over time, while prisoners are participating in and

18 USC 3601 prec.

Deadline.

**Add. 28**

PUBLIC LAW 115–391—DEC. 21, 2018          132 STAT. 5209

completing the effective evidence-based recidivism reduction programs and productive activities.

"(2) PHASE-IN.—In order to carry out paragraph (1), so that every prisoner has the opportunity to participate in and complete the type and amount of evidence-based recidivism reduction programs or productive activities they need, and be reassessed for recidivism risk as necessary to effectively implement the System, the Bureau of Prisons shall—

"(A) provide such evidence-based recidivism reduction programs and productive activities for all prisoners before the date that is 2 years after the date on which the Bureau of Prisons completes a risk and needs assessment for each prisoner under paragraph (1)(A); and

*Time period.*

"(B) develop and validate the risk and needs assessment tool to be used in the reassessments of risk of recidivism, while prisoners are participating in and completing evidence-based recidivism reduction programs and productive activities.

"(3) PRIORITY DURING PHASE-IN.—During the 2-year period described in paragraph (2)(A), the priority for such programs and activities shall be accorded based on a prisoner's proximity to release date.

"(4) PRELIMINARY EXPANSION OF EVIDENCE-BASED RECIDIVISM REDUCTION PROGRAMS AND AUTHORITY TO USE INCENTIVES.—Beginning on the date of enactment of this subsection, the Bureau of Prisons may begin to expand any evidence-based recidivism reduction programs and productive activities that exist at a prison as of such date, and may offer to prisoners who successfully participate in such programs and activities the incentives and rewards described in subchapter D.

*Effective date.*

"(5) RECIDIVISM REDUCTION PARTNERSHIPS.—In order to expand evidence-based recidivism reduction programs and productive activities, the Attorney General shall develop policies for the warden of each prison of the Bureau of Prisons to enter into partnerships, subject to the availability of appropriations, with any of the following:

*Policies.*

"(A) Nonprofit and other private organizations, including faith-based, art, and community-based organizations that will deliver recidivism reduction programming on a paid or volunteer basis.

"(B) Institutions of higher education (as defined in section 101 of the Higher Education Act of 1965 (20 U.S.C. 1001)) that will deliver instruction on a paid or volunteer basis.

"(C) Private entities that will—

"(i) deliver vocational training and certifications;

"(ii) provide equipment to facilitate vocational training or employment opportunities for prisoners;

"(iii) employ prisoners; or

"(iv) assist prisoners in prerelease custody or supervised release in finding employment.

"(D) Industry-sponsored organizations that will deliver workforce development and training, on a paid or volunteer basis.

"(6) REQUIREMENT TO PROVIDE PROGRAMS TO ALL PRISONERS; PRIORITY.—The Director of the Bureau of Prisons shall provide all prisoners with the opportunity to actively participate

**Add. 29**

in evidence-based recidivism reduction programs or productive activities, according to their specific criminogenic needs, throughout their entire term of incarceration. Priority for participation in recidivism reduction programs shall be given to medium-risk and high-risk prisoners, with access to productive activities given to minimum-risk and low-risk prisoners.

"(7) DEFINITIONS.—The terms in this subsection have the meaning given those terms in section 3635.".

(b) PRERELEASE CUSTODY.—

(1) IN GENERAL.—Section 3624 of title 18, United States Code, is amended—

(A) in subsection (b)(1)—

(i) by striking ", beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term," and inserting "of up to 54 days for each year of the prisoner's sentence imposed by the court,"; and

(ii) by striking "credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence" and inserting "credit for the last year of a term of imprisonment shall be credited on the first day of the last year of the term of imprisonment"; and

(B) by adding at the end the following:

"(g) PRERELEASE CUSTODY OR SUPERVISED RELEASE FOR RISK AND NEEDS ASSESSMENT SYSTEM PARTICIPANTS.—

Applicability.

"(1) ELIGIBLE PRISONERS.—This subsection applies in the case of a prisoner (as such term is defined in section 3635) who—

"(A) has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the 'System') in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;

"(B) has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

"(C) has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

Determinations.

"(D)(i) in the case of a prisoner being placed in prerelease custody, the prisoner—

"(I) has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

"(II) has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that—

"(aa) the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

"(bb) the prisoner has made a good faith effort to lower their recidivism risk through participation in recidivism reduction programs or productive activities; and

**Add. 30**

PUBLIC LAW 115–391—DEC. 21, 2018          132 STAT. 5211

"(cc) the prisoner is unlikely to recidivate; or

"(ii) in the case of a prisoner being placed in supervised release, the prisoner has been determined under the System to be a minimum or low risk to recidivate pursuant to the last reassessment of the prisoner.

"(2) TYPES OF PRERELEASE CUSTODY.—A prisoner shall be placed in prerelease custody as follows:

"(A) HOME CONFINEMENT.—                                    Determinations.

"(i) IN GENERAL.—A prisoner placed in prerelease custody pursuant to this subsection who is placed in home confinement shall—

"(I) be subject to 24-hour electronic monitoring that enables the prompt identification of the prisoner, location, and time, in the case of any violation of subclause (II);

"(II) remain in the prisoner's residence, except that the prisoner may leave the prisoner's home in order to, subject to the approval of the Director of the Bureau of Prisons—

"(aa) perform a job or job-related activities, including an apprenticeship, or participate in job-seeking activities;

"(bb) participate in evidence-based recidivism reduction programming or productive activities assigned by the System, or similar activities;

"(cc) perform community service;

"(dd) participate in crime victim restoration activities;

"(ee) receive medical treatment;

"(ff) attend religious activities; or

"(gg) participate in other family-related activities that facilitate the prisoner's successful reentry such as a family funeral, a family wedding, or to visit a family member who is seriously ill; and

"(III) comply with such other conditions as the Director determines appropriate.

"(ii) ALTERNATE MEANS OF MONITORING.—If the electronic monitoring of a prisoner described in clause (i)(I) is infeasible for technical or religious reasons, the Director of the Bureau of Prisons may use alternative means of monitoring a prisoner placed in home confinement that the Director determines are as effective or more effective than the electronic monitoring described in clause (i)(I).

"(iii) MODIFICATIONS.—The Director of the Bureau of Prisons may modify the conditions described in clause (i) if the Director determines that a compelling reason exists to do so, and that the prisoner has demonstrated exemplary compliance with such conditions.

"(iv) DURATION.—Except as provided in paragraph (4), a prisoner who is placed in home confinement shall remain in home confinement until the prisoner has served not less than 85 percent of the prisoner's imposed term of imprisonment.

**Add. 31**

"(B) RESIDENTIAL REENTRY CENTER.—A prisoner placed in prerelease custody pursuant to this subsection who is placed at a residential reentry center shall be subject to such conditions as the Director of the Bureau of Prisons determines appropriate.

"(3) SUPERVISED RELEASE.—If the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment pursuant to section 3583, the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632.

"(4) DETERMINATION OF CONDITIONS.—In determining appropriate conditions for prisoners placed in prerelease custody pursuant to this subsection, the Director of the Bureau of Prisons shall, to the extent practicable, provide that increasingly less restrictive conditions shall be imposed on prisoners who demonstrate continued compliance with the conditions of such prerelease custody, so as to most effectively prepare such prisoners for reentry.

"(5) VIOLATIONS OF CONDITIONS.—If a prisoner violates a condition of the prisoner's prerelease custody, the Director of the Bureau of Prisons may impose such additional conditions on the prisoner's prerelease custody as the Director of the Bureau of Prisons determines appropriate, or revoke the prisoner's prerelease custody and require the prisoner to serve the remainder of the term of imprisonment to which the prisoner was sentenced, or any portion thereof, in prison. If the violation is nontechnical in nature, the Director of the Bureau of Prisons shall revoke the prisoner's prerelease custody.

Consultation.
Detemination.

"(6) ISSUANCE OF GUIDELINES.—The Attorney General, in consultation with the Assistant Director for the Office of Probation and Pretrial Services, shall issue guidelines for use by the Bureau of Prisons in determining—

"(A) the appropriate type of prerelease custody or supervised release and level of supervision for a prisoner placed on prerelease custody pursuant to this subsection; and

"(B) consequences for a violation of a condition of such prerelease custody by such a prisoner, including a return to prison and a reassessment of evidence-based recidivism risk level under the System.

"(7) AGREEMENTS WITH UNITED STATES PROBATION AND PRETRIAL SERVICES.—The Director of the Bureau of Prisons shall, to the greatest extent practicable, enter into agreements with United States Probation and Pretrial Services to supervise prisoners placed in home confinement under this subsection. Such agreements shall—

"(A) authorize United States Probation and Pretrial Services to exercise the authority granted to the Director pursuant to paragraphs (3) and (4); and

"(B) take into account the resource requirements of United States Probation and Pretrial Services as a result of the transfer of Bureau of Prisons prisoners to prerelease custody or supervised release.

PUBLIC LAW 115–391—DEC. 21, 2018          132 STAT. 5213

"(8) ASSISTANCE.—United States Probation and Pretrial Services shall, to the greatest extent practicable, offer assistance to any prisoner not under its supervision during prerelease custody under this subsection.

"(9) MENTORING, REENTRY, AND SPIRITUAL SERVICES.—Any prerelease custody into which a prisoner is placed under this subsection may not include a condition prohibiting the prisoner from receiving mentoring, reentry, or spiritual services from a person who provided such services to the prisoner while the prisoner was incarcerated, except that the warden of the facility at which the prisoner was incarcerated may waive the requirement under this paragraph if the warden finds that the provision of such services would pose a significant security risk to the prisoner, persons who provide such services, or any other person. The warden shall provide written notice of any such waiver to the person providing such services and to the prisoner.

"(10) TIME LIMITS INAPPLICABLE.—The time limits under subsections (b) and (c) shall not apply to prerelease custody under this subsection.

"(11) PRERELEASE CUSTODY CAPACITY.—The Director of the Bureau of Prisons shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners.".

(2) EFFECTIVE DATE.—The amendments made by this subsection shall take effect beginning on the date that the Attorney General completes and releases the risk and needs assessment system under subchapter D of chapter 229 of title 18, United States Code, as added by section 101(a) of this Act.

(3) APPLICABILITY.—The amendments made by this subsection shall apply with respect to offenses committed before, on, or after the date of enactment of this Act, except that such amendments shall not apply with respect to offenses committed before November 1, 1987.

**SEC. 103. GAO REPORT.**

Not later than 2 years after the Director of the Bureau of Prisons implements the risk and needs assessment system under section 3621 of title 18, United States Code, and every 2 years thereafter, the Comptroller General of the United States shall conduct an audit of the use of the risk and needs assessment system at Bureau of Prisons facilities. The audit shall include analysis of the following:

(1) Whether inmates are being assessed under the risk and needs assessment system with the frequency required under such section 3621 of title 18, United States Code.

(2) Whether the Bureau of Prisons is able to offer recidivism reduction programs and productive activities (as such terms are defined in section 3635 of title 18, United States Code, as added by section 101(a) of this Act).

(3) Whether the Bureau of Prisons is offering the type, amount, and intensity of recidivism reduction programs and productive activities for prisoners to earn the maximum amount of time credits for which they are eligible.

(4) Whether the Attorney General is carrying out the duties under section 3631(b) of title 18, United States Code, as added by section 101(a) of this Act.

Waiver authority.

Notice.

18 USC 3624 note.

18 USC 3624 note.

Time period. Audit. Analysis. 18 USC 3621 note.

**Add. 33**

(5) Whether officers and employees of the Bureau of Prisons are receiving the training described in section 3632(f) of title 18, United States Code, as added by section 101(a) of this Act.

(6) Whether the Bureau of Prisons offers work assignments to all prisoners who might benefit from such an assignment.

(7) Whether the Bureau of Prisons transfers prisoners to prerelease custody or supervised release as soon as they are eligible for such a transfer under section 3624(g) of title 18, United States Code, as added by section 102(b) of this Act.

(8) The rates of recidivism among similarly classified prisoners to identify any unwarranted disparities, including disparities among similarly classified prisoners of different demographic groups, in such rates.

**SEC. 104. AUTHORIZATION OF APPROPRIATIONS.**

(a) IN GENERAL.—There is authorized to be appropriated to carry out this title $75,000,000 for each of fiscal years 2019 through 2023. Of the amount appropriated under this subsection, 80 percent shall be reserved for use by the Director of the Bureau of Prisons to implement the system under section 3621(h) of title 18, United States Code, as added by section 102(a) of this Act.

(b) SAVINGS.—It is the sense of Congress that any savings associated with reductions in recidivism that result from this title should be reinvested—

(1) to supplement funding for programs that increase public safety by providing resources to State and local law enforcement officials, including for the adoption of innovative technologies and information sharing capabilities;

(2) into evidence-based recidivism reduction programs offered by the Bureau of Prisons; and

(3) into ensuring eligible prisoners have access to such programs and productive activities offered by the Bureau of Prisons.

18 USC 3621 note.

**SEC. 105. RULE OF CONSTRUCTION.**

Nothing in this Act, or the amendments made by this Act, may be construed to provide authority to place a prisoner in prerelease custody or supervised release who is serving a term of imprisonment pursuant to a conviction for an offense under the laws of one of the 50 States, or of a territory or possession of the United States or to amend or affect the enforcement of the immigration laws, as defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101).

18 USC 3621 note.

**SEC. 106. FAITH-BASED CONSIDERATIONS.**

(a) IN GENERAL.—In considering any program, treatment, regimen, group, company, charity, person, or entity of any kind under any provision of this Act, or the amendments made by this Act, the fact that it may be or is faith-based may not be a basis for any discrimination against it in any manner or for any purpose.

(b) ELIGIBILITY FOR EARNED TIME CREDIT.—Participation in a faith-based program, treatment, or regimen may qualify a prisoner for earned time credit under subchapter D of chapter 229 of title 18, United States Code, as added by section 101(a) of this Act, however, the Director of the Bureau of Prisons shall ensure that non-faith-based programs that qualify for earned time credit are

PUBLIC LAW 115–391—DEC. 21, 2018       132 STAT. 5215

offered at each Bureau of Prisons facility in addition to any such faith-based programs.

(c) LIMITATION ON ACTIVITIES.—A group, company, charity, person, or entity may not engage in explicitly religious activities using direct financial assistance made available under this title or the amendments made by this title.

(d) RULE OF CONSTRUCTION.—Nothing in this Act, or the amendments made by this Act, may be construed to amend any requirement under Federal law or the Constitution of the United States regarding funding for faith-based programs or activities.

**SEC. 107. INDEPENDENT REVIEW COMMITTEE.**

18 USC 3631 note.
Consultation.

(a) IN GENERAL.—The Attorney General shall consult with an Independent Review Committee in carrying out the Attorney General's duties under sections 3631(b), 3632 and 3633 of title 18, United States Code, as added by section 101(a) of this Act.

(b) FORMATION OF INDEPENDENT REVIEW COMMITTEE.—The National Institute of Justice shall select a nonpartisan and nonprofit organization with expertise in the study and development of risk and needs assessment tools to host the Independent Review Committee. The Independent Review Committee shall be established not later than 30 days after the date of enactment of this Act.

Deadline.

(c) APPOINTMENT OF INDEPENDENT REVIEW COMMITTEE.—The organization selected by the National Institute of Justice shall appoint not fewer than 6 members to the Independent Review Committee.

(d) COMPOSITION OF THE INDEPENDENT REVIEW COMMITTEE.— The members of the Independent Review Committee shall all have expertise in risk and needs assessment systems and shall include—

(1) 2 individuals who have published peer-reviewed scholarship about risk and needs assessments in both corrections and community settings;

(2) 2 corrections practitioners who have developed and implemented a risk assessment tool in a corrections system or in a community supervision setting, including 1 with prior experience working within the Bureau of Prisons; and

(3) 1 individual with expertise in assessing risk assessment implementation.

(e) DUTIES OF THE INDEPENDENT REVIEW COMMITTEE.—The Independent Review Committee shall assist the Attorney General in carrying out the Attorney General's duties under sections 3631(b), 3632 and 3633 of title 18, United States Code, as added by section 101(a) of this Act, including by assisting in—

(1) conducting a review of the existing prisoner risk and needs assessment systems in operation on the date of enactment of this Act;

(2) developing recommendations regarding evidence-based recidivism reduction programs and productive activities;

Recommendations.

(3) conducting research and data analysis on—

Data analysis.

(A) evidence-based recidivism reduction programs relating to the use of prisoner risk and needs assessment tools;

(B) the most effective and efficient uses of such programs; and

(C) which evidence-based recidivism reduction programs are the most effective at reducing recidivism, and

**Add. 35**

the type, amount, and intensity of programming that most effectively reduces the risk of recidivism; and

(4) reviewing and validating the risk and needs assessment system.

(f) BUREAU OF PRISONS COOPERATION.—The Director of the Bureau of Prisons shall assist the Independent Review Committee in performing the Committee's duties and promptly respond to requests from the Committee for access to Bureau of Prisons facilities, personnel, and information.

(g) REPORT.—Not later than 2 years after the date of enactment of this Act, the Independent Review Committee shall submit to the Committee on the Judiciary and the Subcommittee on Commerce, Justice, Science, and Related Agencies of the Committee on Appropriations of the Senate and the Committee on the Judiciary and the Subcommittee on Commerce, Justice, Science, and Related Agencies of the Committee on Appropriations of the House of Representatives a report that includes—

List.

(1) a list of all offenses of conviction for which prisoners were ineligible to receive time credits under section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, and for each offense the number of prisoners excluded, including demographic percentages by age, race, and sex;

(2) the criminal history categories of prisoners ineligible to receive time credits under section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, and for each category the number of prisoners excluded, including demographic percentages by age, race, and sex;

(3) the number of prisoners ineligible to apply time credits under section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, who do not participate in recidivism reduction programming or productive activities, including the demographic percentages by age, race, and sex;

Recommendations.

(4) any recommendations for modifications to section 3632(d)(4)(D) of title 18, United States Code, as added by section 101(a) of this Act, and any other recommendations regarding recidivism reduction.

(h) TERMINATION.—The Independent Review Committee shall terminate on the date that is 2 years after the date on which the risk and needs assessment system authorized by sections 3632 and 3633 of title 18, United States Code, as added by section 101(a) of this Act, is released.

Lieutenant Osvaldo Albarati Correctional Officer Self-Protection Act of 2018.
18 USC 1 note.

# TITLE II—BUREAU OF PRISONS SECURE FIREARMS STORAGE

**SEC. 201. SHORT TITLE.**

This title may be cited as the "Lieutenant Osvaldo Albarati Correctional Officer Self-Protection Act of 2018".

**SEC. 202. SECURE FIREARMS STORAGE.**

(a) IN GENERAL.—Chapter 303 of title 18, United States Code, is amended by adding at the end the following:

18 USC 4050.

**"§ 4050. Secure firearms storage**

"(a) DEFINITIONS.—In this section—